**UNITED STATES v. ALASKA S. S. CO. et al.**

Civ. No. 2682; Crim. No. 48201.

United States District Court

W. D. Washington, N. D.

Sept. 29, 1952.

Bogle, Bogle & Gates, Seattle, Wash., for defendants.

LEMMON, District Judge.

Illustrating the growing importance of administrative law, these cases require a study of the role played by what is now known as the Federal Maritime Board, 46 U.S.C.A. § 1111, note, under the Shipping Act of 1916, as amended, 46 U.S.C.A. § 801 et seq., vis-à-vis civil and criminal actions brought by the United States under the Antitrust Acts, 15 U.S.C.A. § 1 et seq. This in turn calls for a survey of the boundaries of the Board's "primary jurisdiction".

The defendants in the criminal and in the civil action are identical. They consist of the corporation and five of its officers. The corporate defendant was organized under the laws of the State of Washington and has its principal place of business at Seattle, Washington, where the individual defendants all reside.

#### 1. The Indictment

On November 2, 1950, the United States District Court for the District of Alaska, Third Division, entered an order granting a motion of the defendants; over the plaintiff's objection, for a change of venue in the criminal case under Rule 21(b), Federal Rules of Criminal Procedure, 18 U.S.C.A., from the Alaska Court to this court.

After setting forth considerable material relating to definitions, the defendants, and the nature of Alaska trade and commerce—material not essential to an understanding of the law points discussed herein—the indictment contains the following pertinent allegations:

· Beginning about 1944, and continuing thereafter until the return of the indict-

ment, the defendants and others have engaged in a wrongful and unlawful combination and conspiracy to exclude, prevent, and restrain the actual and potential competition of water and motor truck carriers with the defendants in the transportation of freight and passengers to, from, and between points in the Territory of Alaska.

This combination has been and is now in unreasonable restraint of the said trade and commerce, in violation of 15 U.S.C.A. section 3, commonly known as the Sherman Act.

The conspiracy has consisted of the defendants' agreement:

(a) To acquire a virtual monopoly of the transportation of persons and commodities by water for hire in the Alaska trade by merging the operations of the Northland Transportation Company and the Alaska Steamship Company, the corporate defendant which is hereinafter referred to as Alaska Steam; by hindering, obstructing, and preventing others from chartering vessels for the purpose of entering the Alaska trade in competition with them; and by attempting to acquire control of, eliminate competition with, and merge the defendants' operations with those of the Alaska Transportation Company, their largest remaining competitor;

(b) To maintain and perpetuate their virtual monopoly of transporting passengers and freight by water in the Alaska trade, and to prevent and eliminate the actual and potential competition of other water carriers by entering into agreements with shippers by the terms of which the latter are required to deal exclusively with them and to refrain from doing business with competing water carriers; and by utilizing their position as the only carrier serving the whole of Alaska and offering a full line of shipping service, to coerce shippers to ship exclusively with them.

This coercion was to be carried out as follows:

(1) By threatening to limit, delay, or withdraw the service of carrying supplies north to canneries and fisheries and other industrial users in Alaska unless such shippers patronize them exclusively in the transportation of fish and other products south from Alaska;

(2) By threatening to limit, delay, or withdraw the service of transporting perishables under refrigeration unless shippers desiring or requiring this service patronize them exclusively in the transportation of non-perishable freight;

(3) By threatening to limit, delay or withdraw the service of transporting passengers unless shippers desiring such service patronize them exclusively in freight transportation;

(4) By threatening to limit, delay, or withdraw the service of transporting dry cargo unless shippers requiring such service patronize them exclusively in the transportation of fish oil or other bulk liquids;

(5) By threatening to limit, delay, or withdraw service to shippers patronizing any other water carrier;

(6) By threatening to limit, delay, or withdraw service to shippers to, from, or between Alaska points, which only the defendants serve, if shippers requiring or desiring such service patronize any other water carrier serving any other Alaska points;

(7) By threatening to increase freight rates on particular commodities unless shippers of such commodities deal exclusively with them and refrain from dealing with any other water carrier;

(8) By offering to reduce and reducing freight rates on particular commodities if shippers deal with them and refrain from dealing with other water carriers;

(9) By inducing and compelling shippers to breach existing contracts and agreements to ship freight with other water carriers by the several means alleged in sub-paragraphs (1) through (8) of this sub-paragraph;

(10) By causing field representatives and agents of the defendants to determine the identity of shippers who patronize other water carriers, by maintaining a systematic surveillance of docks and terminals; by obtaining access to competi-

tors' freight manifests, and by other means; and by thereafter causing the field representatives and agents to call upon shippers that have patronized another water carrier, and inform the shippers of the defendants' awareness that the shippers have patronized another water carrier, demand an explanation of the shipper's conduct, threaten him in the manner alleged in sub-paragraphs (1) through (7) of this sub-paragraph if the shipper again patronized another carrier, and by other means intimidate, harass, and annoy the shipper.

Continuing its recital of the means whereby the defendants planned to "maintain and perpetuate their virtual monopoly", the indictment alleges that it was to be done also by diverting or scheduling their "ships so as to split or reduce cargo available to other water carriers", and by "denying other water carriers reasonable access to dock and terminal facilities at Alaskan ports".

Such denial of access, in turn, was to be accomplished by "diverting or scheduling defendants' ships to arrive before" those of their competitors and by "unreasonably delaying the departure of defendants' ships" so as to block the port facilities, and by threatening to delay or misroute freight destined to a particular Alaska port unless the ships of other carriers were required to move from terminal facilities, thus granting the defendants' vessels immediate access thereto.

Finally, the indictment avers that the defendants have agreed to prevent and eliminate "the actual and potential competition" of motor truck carriers in Alaska by hindering the movement of freight from Canada and the continental United States to interior Alaskan points by rail and motor carrier, by inducing railroads to refrain from establishing rail rates requested by motor truck carriers, and by hindering the movement of freight by truck from Alaskan ports to interior points by limiting, withdrawing, or refusing to furnish water-carrier service required for such movement.

It is further charged that the defendants have accomplished the objects of their conspiracy, which were to "drive out, exclude, and prevent" competition and "to achieve for defendants a virtual monopoly."

As a result of the above "offenses" the defendants have "achieved" the control of passenger and freight transportation by water "between the United States and Alaska and between ports in Alaska", and have "substantially" obstructed such motor-carrier transportation, etc.

On the question of venue, the indictment states that the conspiracy has been formed in part and carried out in part within the Third Division of the District of Alaska, and that within three years next preceding the return date of the indictment, the defendants have performed, within the said Division, many of the acts constituting the practices set forth, etc.

## 2. The Civil Complaint

Instituted under the provisions of 15 U. S.C.A. § 4, the civil complaint contains substantially the same allegations as the indictment, with a few minor variations not pertinent to the court's view of the case.

The lengthy prayer likewise need not be summarized here. Suffice it to say that it seeks injunctive relief against most of the acts also complained of in the indictment.

## 3. The Motions to Dismiss and to Stay

The defendants have filed motions to dismiss with prejudice on the ground of the "exclusive or primary" jurisdiction of the Federal Maritime Board; and, alternatively, to dismiss without prejudice, or to stay proceedings, pending the final determination by the Maritime Board of Docket No. 661, "or any other appropriate proceedings".

These motions will be considered together.

## 4. The Trend Toward the "Primary Jurisdiction" Doctrine

For more than a half-century there has been a definite tendency in the Congress and in the Federal courts toward a wider recognition of the so-called "pri-

mary jurisdiction" principle. According to that doctrine, controversies requiring for their solution specialized skill or knowledge should be passed upon in the first instance by the appropriate administrative boards.

The rationale of this rule is not, as one might think, to lighten the case-load of the courts, but to avail litigants of the superior technical experience—"expertise", Mr. Justice Frankfurter is fond of calling it—of specially constituted investigative bodies. Furthermore, the Supreme Court, especially in its earlier decisions on the subject, has pointed out that if a court and an administrative body *each* had primary jurisdiction, the one might rule in the opposite manner from the other in different suits involving similar facts. In that way "uniformity and equality" would be destroyed.

The leading case on the subject is Cincinnati, N. O. & T. P. R. Co. v. Interstate Commerce Commission, 1896, 162 U.S. 184, 196, 16 S.Ct. 700, 705, 40 L.Ed. 935. In that case the Court said:

"The commission is an administrative board, and the courts are only to be resorted to when the commission prefers to enforce the provisions of the statute by a direct proceeding in the court, or when the orders of the commission have been disregarded. The theory of the act evidently is, as shown by the provision, that the

findings of the commission shall be regarded as prima facie evidence, that the facts of the case are to be disclosed before the commission. We do not mean, of course, that either party, in a trial in the court, is to be restricted to the evidence that was before the commission, but that the purposes of the act call for a full inquiry by the commission into all the circumstances and conditions pertinent to the questions involved."[1]

5. The Trend Becomes More Marked in Decisions Interpreting the Shipping Act of 1916

This legislative and judicial inclination to rely upon the "expertise" of administrative boards became decidedly more marked after the passage of the Shipping Act of 1916.

The leading case involving that statute is United States Navigation Company v. Cunard Steamship Co., 1932, 284 U.S. 474, 52 S.Ct. 247, 76 L.Ed. 408. Because of the importance and the relevancy of that decision and because of its somewhat full summary of the Shipping Act itself, it will be helpful to quote from the opinion at some length:

"It may be conceded that looking alone to the Sherman Anti-Trust Act the bill states a cause of action under sections 1 and 2 of that act and con-

---

1. See also Louisville & Nashville Railroad Company v. Behlmer, 1900, 175 U.S. 648, 675, 20 S.Ct. 209, 44 L.Ed. 309; Texas & Pacific Railway Company v. Abilene Cotton Oil Company, 1907, 204 U.S. 426, 440–441, 448, 27 S.Ct. 350, 51 L.Ed. 553; Baltimore & Ohio R. Co. v. United States ex rel. Pitcairn Coal Co., 1910, 215 U.S. 481, 493, 30 S.Ct. 164, 54 L.Ed. 292; Robinson v. Baltimore & Ohio R. Co., 1912, 222 U.S. 506, 509–511, 32 S.Ct. 114, 56 L.Ed. 288; Pennsylvania R. Co. v. International Coal Mining Co., 1913, 230 U.S. 184, 196, 33 S.Ct. 893, 57 L.Ed. 1446; Texas & Pacific Railway Co. v. American Tie & Timber Co., 1914, 234 U.S. 138, 146, 34 S.Ct. 885, 58 L.Ed. 1255; Mitchell Coal & Coke Co. v. Pennsylvania R. Co., 1913, 230 U.S. 247, 256–257, 33 S.Ct. 916, 57 L.Ed. 1472; Pennsylvania R. Co. v. Puritan Coal Min. Co., 1915, 237 U.S. 121, 131, 35 S.Ct. 484, 59 L.Ed. 867; Loomis v. Lehigh Valley R. Co., 1916, 240 U.S. 43, 49–50, 36 S.Ct. 228, 60 L.Ed. 517; Northern Pacific R. Co. v. Solum, 1918, 247 U.S. 477, 483, 38 S.Ct. 550, 62 L.Ed. 1221; Director General of Railroads v. Viscose Co., 1921, 254 U.S. 498, 504, 41 S.Ct. 151, 65 L.Ed. 372; Great Northern R. Co. v. Merchants Elevator Co., 1925, 259 U.S. 285, 291, 42 S.Ct. 477, 66 L. Ed. 913; Keogh v. Chicago & Northwestern Ry. Co., 1922, 260 U.S. 156, 161–164, 43 S.Ct. 47, 67 L.Ed. 183; Terminal R. R. Ass'n v. United States, 1924, 266 U.S. 17, 31, 45 S.Ct. 5, 69 L. Ed. 150; Western & Atlantic R. R. v. Georgia Pub. Serv. Comm., 1925, 267 U. S. 493, 497, 45 S.Ct. 409, 69 L.Ed. 753; Midland Valley R. R. v. Barkley, 1928, 276 U.S. 482, 485–486, 48 S.Ct. 342, 72 L.Ed. 664; Board of R. R. Com'rs of State of N. D. v. Great Northern Ry. Co., 1930, 281 U.S. 412, 421–422, 50 S.Ct. 391, 74 L.Ed. 936.

sequently furnishes ground for an injunction under section 16 of the Clayton Act unless the Shipping Act stands in the way; and this was the view of both courts below.

"The Shipping Act is a comprehensive measure bearing a relation to common carriers by water substantially the same as that borne by the Interstate Commerce Act to interstate common carriers by land. When the Shipping Act was passed, the Interstate Commerce Act had been in force in its original form or in amended forms for more than a generation. Its provisions had been applied to a great variety of situations, and had been judicially construed in a large number and variety of cases. The rule had become settled that questions essentially of fact and those involving the exercise of administrative discretion, which were within the jurisdiction of the Interstate Commerce Commission, were primarily within its exclusive jurisdiction, and, with certain exceptions not applicable here, that a remedy must be sought from the Commission before the jurisdiction of the courts could be invoked. In this situation, the Shipping Act was passed. In its general scope and purpose, as well as in its terms, that act closely parallels the Interstate Commerce Act; and we cannot escape the conclusion that Congress intended that the two acts, each in its own field, should have like interpretation, application, and effect. It follows that the settled construction in respect of the earlier act must be applied to the later one, unless, in particular instances, there be something peculiar in the question under consideration, or dissimilarity in the terms of the act relating thereto, requiring a different conclusion." 284 U.S. at pages 480-481, 52 S.Ct. at page 249.

After referring to several of the cases collected in Footnote [1], ante, the court gave a concise but authoritative résumé of the statute:

"That the Shipping Act covers the dominant facts alleged in the present case as constituting a violation of the Anti-Trust Act is clear. Section 14 prohibits retaliation by a common carrier by water against any shipper by resort to discriminating or unfair methods because the shipper has patronized another carrier; and section 14a confers power upon the Board to determine the question. The latter section also confers similar power on the Board in respect of any combination, agreement, or understanding involving transportation of passengers or property between foreign ports, deferred rebates, or any other unfair practice designated in section 14. Section 16 makes it unlawful for any such carrier, alone or in conjunction with another, to give any undue or unreasonable preference or advantage to any particular person, locality, or description of traffic, or to subject any such person, locality, or traffic to undue or unreasonable prejudice or disadvantage in any respect, or to allow any person to obtain transportation for property at less than the regular rates by any unjust or unfair device or means. Section 17 prohibits any charge or rate unjustly discriminatory between shippers or ports, etc., and gives the Board authority to alter the same to the extent necessary to correct the discrimination or prejudice, and to order the carrier to discontinue. Section 22 authorizes any person to file with the Board a complaint, setting forth any violation of the act by a common carrier by water, and asking reparation for the injury. Copy of the complaint is to be furnished to the carrier, who is required to satisfy the complaint or answer it in writing. If not satisfied, the Board is authorized to investigate the case and make such order as it deems proper, and the Board may direct payment of full reparation for the injury caused by such violation. The Board is also au-

---

1. See note 1 on page 107.

thorized, upon its own motion, except as to orders for the payment of money, to investigate any violation of the act. We need not pursue the analysis further. These and other provisions of the Shipping Act clearly exhibit the close parallelism between that act and its prototype, the Interstate Commerce Act, and the applicability to both of like principles of construction and administration." 284 U.S. at pages 483–484, 52 S.Ct. at page 250.

The court adverted to the fact that whether a given agreement among common carriers by water should be held to violate the act depended upon a consideration of "circumstances, generally unfamiliar to a judicial tribunal, but well understood by an administrative body especially trained and experienced in the intricate and technical facts and usages of the shipping trade, and with which that body, consequently, is better able to deal." 284 U.S. at page 485, 52 S.Ct. at page 250.

The paramount and exclusive character of the Shipping Act in relation to the anti-trust laws was thus emphasized by the Supreme Court;

"A comparison of the enumeration of wrongs charged in the bill with the provisions of the sections of the Shipping Act above outlined conclusively shows, without going into detail, that the allegations either constitute direct and basic charges of violations of these provisions, or are so interrelated with such charges as to be, in effect, a component part of them; *and the remedy is that afforded by the Shipping Act, which to that extent supersedes the anti-trust laws.* [Case cited.] *The matter therefore is within the exclusive preliminary jurisdiction of the Shipping Board.* The scope and evident purpose of the Shipping Act, as in the case of the Interstate Commerce Act, [are] demonstrative of this conclusion. Indeed, if there be a difference, the conclusion as to the first-named act rests upon stronger ground, since the decisions of this court compelling a preliminary resort to the Commission were made in the face of a clause in section 22 of the Interstate Commerce Act that nothing therein contained should in any way abridge or alter existing common-law or statutory remedies, but that the provisions of the act were in addition to such remedies [case cited]; a clause that finds no counterpart in the Shipping Act." 284 U.S. at pages 485–486, 52 S.Ct. at page 250. (Emphasis supplied.)

The opinion then points out that "There is nothing in Section 15 of the Shipping Act, 46 U.S.C.A. § 814, which militates against the foregoing views." That section requires that certain agreements between carriers shall be filed immediately with the Board.

The opinion adds:

"But a failure to file such an agreement with the board will not afford ground for an injunction under section 16 of the Clayton Act (15 USCA § 26) at the suit of private parties, *whatever, in that event, may be the rights of the government * * *.*" (Emphasis supplied.) 284 U.S. at page 486, 52 S.Ct. at page 251.

In its briefs in both the civil and the criminal cases, the plaintiff has sought to derive comfort from the foregoing emphasized language. As will be seen in a moment, however, its comfort has been short-lived!

In Swayne & Hoyt, Ltd., v. United States, 1937, 300 U.S. 297, 303–304, 57 S.Ct. 478, 481, 81 L.Ed. 659, the Supreme Court followed the holdings in the Cunard case, supra, to the effect that the Shipping Act is "closely parallel" to the Interstate Commerce Act and that "Both have set up an administrative agency to whose informed judgment and discretion Congress has committed the determination of questions of fact, on the basis of which it is authorized to make administrative orders."

6. *The Federal Maritime Board Has Primary Jurisdiction Even When It Is the Government That Invokes the Antitrust Acts*

On March 10, 1952, the Supreme Court took the final step in establishing the pri-

mary jurisdiction of the Federal Maritime Board in controversies involving violations of the Antitrust Acts.

In Far East Conference v. United States, 1952, 342 U.S. 570, 72 S.Ct. 492, 96 L.Ed. 576, the United States brought a suit to enjoin violations of the Sherman Law. The defendants were the Far East Conference, a voluntary association, and its constituent members—steamship . companies engaged in the "outbound Far East trade." The Conference was organized in 1922, and the agreement under which it operates was approved by the United States Shipping Board, a predecessor of the Federal Maritime Board.

Under that agreement, there had been established a dual system of rates, called the contract and noncontract rate system, similar in purpose and effect to the "agreements", "threats", and "offers", supra, charged by the plaintiff in the instant cases. Shippers who agreed to use exclusively the ships of Conference members paid one rate, while those who did not so bind themselves paid a higher rate. On their part, however, Conference members were obligated to supply adequate facilities.

The defendants justified the dual-rate system on the merits, but moved for a dismissal on the ground that the nature of the issues required previous resort to the Federal Maritime Board, which, as intervener, joined in the motion.

Without any qualification, the court followed the Cunard decision, supra. After quoting from that opinion. Mr. Justice Frankfurter said:

"The Court thus applied a principle, now firmly established, that in cases raising issues of fact not within the conventional experience of judges or cases requiring the exercise of administrative discretion, agencies created by Congress for regulating the subject matter should not be passed over. This is so even though the facts after they have been appraised by specialized competence serve as a premise for legal consequences to be judicially defined. Uniformity and consistency in the regulation of business entrusted to a particular agency are secured, and the limited functions of review by the judiciary are more rationally exercised, by preliminary resort for ascertaining and interpreting the circumstances underlying legal issues to agencies that are better equipped than courts by specialization, by insight gained through experience, and by more flexible procedure." 342 U.S. at pages 574–575, 72 S.Ct. at page 494.

It will be recalled that in its briefs the plaintiff had insisted strenuously upon the "inapplicability" of the primary jurisdiction doctrine "to suits by the United States". In the Far East Conference case, however, such an argument was completely demolished by the court:

"The sole distinction between the Cunard case and this is that there a private shipper invoked the Anti-Trust Acts and here it is the Government. This difference does not touch the factors that determined the Cunard case. The same considerations of administrative expertise apply, whoever initiates the action. The same Anti-Trust Laws and the same Shipping Act apply to the same dual-rate system. To the same extent they define the appropriate orbits of action as between court and Maritime Board." 342 U.S. at page 576, 72 S.Ct. at page 495.

While now conceding, as it must, that it was wrong in its insistence that "the Government, per se, in prosecuting [sic] the Sherman Act, could not be covered by the primary jurisdiction doctrine," the plaintiff seeks to derive consolation from a single sentence in the very paragraph just quoted, that gave its principal contention its death-blow:

"The sole distinction between the Cunard case and this is that there a private shipper invoked the Anti-Trust Acts and here it is the Government."

It seems that the zeal of an advocate has led counsel into error. It is difficult to see how the Far Eastern Conference decision, sweeping away the distinction to which the plaintiff at first clung with such tenacity, can aid it in any way. Counsel

insists that this recent decision compels us to "look back to the Cunard case and other decisions of the Supreme Court to see just what the requisites are, what they must be, in a primary jurisdiction problem".

The fallacy that lurks in the plaintiff's argument stems from its misconception that this most recent Supreme Court decision on the subject compels us to "look back" at all. The Far Eastern Conference case constitutes another milestone in the tendency that we have already noted—a tendency to rely more and more upon administrative "expertise". This latest decision invites us to look not "back" but "forward".

In addition, the plaintiff urges a final argument: The Far Eastern Conference case involved only a civil action, while we have here a criminal action as well. This court is not impressed with this attempted distinction. All the arguments in favor of letting an experienced administrative board exercise its primary jurisdiction applies with equal force in a criminal case as in a civil case. The rationale applicable to the two types of action is the same.

The plaintiff seems to have been grasping at straws in its attempts to defeat the primary jurisdiction of the Federal Maritime Board in Antitrust cases. Before the Far Eastern Conference decision, it stoutly argued that the Cunard doctrine related only to suits *in which the Government was not a party*. With that straw snatched away by the Supreme Court, the plaintiff grasps at another; namely, that the Far Eastern Conference decision applies only to *civil* suits brought by the Government under the Antitrust Acts. This court is not impressed with that sort of argument.

### 7. Conclusion

█ Both reason and authority persuade this court that the Federal Maritime Board has primary jurisdiction of this controversy, in its criminal as well as its civil aspect.

Here again the court will be guided by the teaching of the Far Eastern Conference case, supra:

"Having concluded that initial submission to the Federal Maritime Board

is required, we may either order the case retained on the District Court docket pending the Board's action, * * * or order dismissal of the proceeding brought in the District Court. * * * We believe that no purpose will here be served to hold the present action in abeyance in the District Court while the proceeding before the Board and subsequent judicial review or enforcement of its order are being pursued. A similar suit is easily initiated later, if appropriate. Business-like procedure counsels that the Government's complaint should now be dismissed, as was the complaint in United States Navigation Co. v. Cunard Steamship Co., supra." 342 U.S. at pages 576–577, 72 S.Ct. at page 495.

Accordingly, the motions to dismiss the indictment and the civil complaint are hereby granted.