UNITED STATES of America, Plaintiff,

v.

GENERAL DYNAMICS CORPORATION, James M. Beggs, Ralph E. Hawes, Jr., David L. McPherson, James C. Hansen, Jr., Defendants.

No. CR–85–1123 FFF.

United States District Court,
C.D. California.

Oct. 1, 1986.

As Amended Oct. 28, 1986.

Randy I. Bellows, Michael L. Fayad, Brenda Gruss, Fraud Section, U.S. Dept. of Justice, Washington, D.C., J. Stephen Czuleger, Asst. U.S. Atty., Los Angeles, Cal., for plaintiff.

Thomas P. Sullivan, Robert T. Markowski, Jenner & Block, Chicago, Ill., Stephen D. Miller, Stephen D. Miller, Inc., Beverly Hills, Cal., James J. Gallagher, McKenna, Conner & Cuneo, Los Angeles, Cal., for defendant General Dynamics Corp.

Vincent J. Fuller, Judith A. Miller, Williams & Connolly, Washington, D.C., Bert H. Deixler, McCambridge & Deixler, Los Angeles, Cal., for defendant James M. Beggs.

Thomas E. Holliday, Gibson, Dunn & Crutcher, Los Angeles, Cal., for defendant Ralph E. Hawes, Jr.

Max L. Gillam, Karen R. Leviton, Latham & Watkins, Los Angeles, Cal., for defendant David L. McPherson.

Douglas Dalton, Patricia Eckert, Dalton & Godfrey, Los Angeles, Cal., for defendant James C. Hansen, Jr.

## MEMORANDUM OPINION

FERNANDEZ, District Judge.

On December 2, 1985, the Grand Jury charged General Dynamics Corporation, James M. Beggs, Ralph E. Hawes, Jr., David L. McPherson, and James C. Hansen, Jr., with conspiracy to defraud the United States. It also charged them with a number of substantive offenses for filing false writings and documents with the Department of Defense (DOD). The latter charges were filed under 18 U.S.C. Section 1001.

Defendants have made a number of pretrial motions. Among them are a Motion to Dismiss the Indictment for Failure to Charge an Offense, and a Motion to Dismiss the Indictment on primary jurisdiction grounds. These motions are the subjects of this Opinion.

## I. BACKGROUND

The charges arise out of the activities of the Defendants related to the building of the prototype of a division air defense (DIVAD) gun system. General Dynamics was awarded Contract No. DAAK10–78–C–0058 (hereafter referred to as "the Contract"). The Contract was stated to be a "firm fixed-price (best efforts) contract". Ford Aerospace and Communications Corporation was also awarded a contract to build a DIVAD prototype. The concept of DOD was that these major companies would vigorously compete, and that the prototypes would be involved in a shoot off. A large production contract would then be awarded to the victor.

General Dynamics was to receive forty-one million dollars for work under the Contract. It expended much more than that, and charged a significant part of the extra costs to other funds it had received from DOD. Those funds were for bid and proposal (B & P) and independent research and development (IR & D) tasks.

The Government contends that the Contract was a firm fixed-price contract, and that General Dynamics could only use DIVAD funds to build the prototype, unless it chose to use its own corporate profits to accomplish the Contract's objective. It is said that the people at DOD hoped that General Dynamics would devote its efforts to building the best possible prototype, even if the Contract price was insufficient, since the prospect of winning the ultimate production contract was very attractive. Instead, the Government contends, the Defendants formed a conspiracy to charge the excess costs to the Government by fraudulently using B & P and IR & D funds to pay expenses that should have been charged to DIVAD or absorbed by General Dynamics itself. In order to carry out the conspiracy, the argument goes, the Defendants had to misallocate expenses, create false records, and then make false reports of various kinds to DOD.

The Defendants assert that the Contract was not a firm fixed-price contract, but was a best efforts contract. They further as-

sert that it was clearly a best efforts contract, and even if it was not, it was at least ambiguous. They go on to assert that charges beyond the Contract price could therefore be made to B & P and IR & D without any impropriety whatever. Certainly, they say, their interpretation was a reasonable one, even if it was incorrect. This forms the basis of their claim that the nature of the Contract is such that it cannot support an allegation of criminal wrongdoing.

Defendants also note that the Contract is an extremely complex document, and that its provisions, and the regulations surrounding it, B & P and IR & D funding are so arcane that this Court should refer the question of their proper construction to the administrative body that has been created to deal with DOD contracts—the Armed Services Board of Contract Appeals (hereafter referred to as the "ASBCA" or the "Board").

These issues will now be considered in detail.

## II. DISCUSSION

### A. *The Motion That No Offense Is Stated.*

Defendants have made a Motion under Rule 12(b) of the Federal Rules of Criminal Procedure. That motion is to dismiss the indictment on the ground that the Contract, which forms the very core of the indictment, is either so clearly against the assertions made in the indictment, or so ambiguous, that it cannot sustain the weight of a criminal prosecution. As a subsidiary to this argument, they go on to state that the indictment also rests on equally ambiguous regulations regarding the use of B & P and IR & D funds to accomplish the objectives of the Contract.

The Government suggests that the Court cannot even look at the Contract, since its terms are not pled on the face of the indictment, and a motion to dismiss under Rule 12(b) is limited to the face of the indictment itself. This threshold matter must first be considered.

### (1) *Consideration of the terms of the Contract.*

In the Court's opinion, the Government's view of Fed.R.Crim.P. 12(b) is too narrow. That rule permits the Court to consider a motion which is capable of determination without trial of the general issue. That expressly includes motions based upon claimed defects in the indictment itself. The motion to dismiss is used to attack the indictment. It takes the place of what used to be called a demurrer. The Government's position is founded upon the general rule that this type of motion to dismiss requires the Court to consider all well pleaded allegations as true, and should not involve consideration of other evidence. That rule was set forth in *Las Vegas Merchant Plumbers Ass'n v. United States*, 210 F.2d 732, 741 (9th Cir.1954).

While some courts have stated that one can go beyond the face of the indictment or that one can at least look to the bill of particulars, others take a much more crabbed view and even reject consideration of the bill of particulars itself. In that regard, compare, *United States v. Jones*, 542 F.2d 661, 665 (6th Cir.1976), and *United States v. Carrier*, 672 F.2d 300, 303 n. 5 (2d Cir.1982), *with United States v. Mann*, 517 F.2d 259, 267 (5th Cir.1975), and *United States v. Rubbish Removal, Inc.*, 602 F.Supp. 595, 597–98 (N.D.N.Y.1984). More recently, the Ninth Circuit has outlined its approach to at least some pretrial motions, and has expressed a general view that appears to give district judges a degree of flexibility. *See, United States v. Shortt Accountancy Corp.*, 785 F.2d 1448 (9th Cir.1986).

It is safe to say that the authorities are decidedly against a broad acceptance of evidence when a demurrer-like motion is being considered. However, the Court has not been shown any authority that would preclude referring to matters over which the Court can take judicial notice. This Court is of the opinion that when the propriety of an indictment is considered, judges should be able to and can consider

matters which are the subject of judicial notice in the context of the particular case. That will not cause any untoward expansion of the motion, and will allow it to be decided on principles that comport with reason and good sense, without at the same time converting it into a kind of criminal summary judgment proceeding.

In the case at hand, the Contract is the very subject of the indictment. Its meaning and terms are referred to in the indictment, and neither party can or does take a different position. For example, paragraphs 3 and 4 of the indictment describe the Contract and its requirements. Other paragraphs characterize it as a fixed price contract. (See, for example, paragraph 9). The heart of the conspiracy—its purpose—is said to have been the charging of expenses to other accounts when they should have been charged to the Contract (paragraph 16). Moreover, this is a contract with the Government itself, and there is absolutely no dispute between the parties about what the terms of the Contract are. They do dispute the meaning of those terms, but the words that are used to convey that meaning are agreed to.

In other words, its terms are subject to accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned, and are not subject to any reasonable dispute in the context of this case. *See*, Federal Rule of Evidence 201. If those terms make it clear that the indictment should not proceed, it would be a travesty if the Defendants were forced to engage in a lengthy trial with the inevitable result that the Court would then dismiss the indictment once the Contract came into evidence.

For example, if a contract explicitly and clearly said that a contractor could do "X", and if an indictment were returned that said the contractor had conspired to commit a fraud under the contract by doing "X", it would be absurd to require a trial. Yet that would seem to be the result of the position the Government has asked this Court to take. The Court will not do so. It will consider the Contract.

*(2) The Substance of the Motion.*

■ Once the Contract comes before the Court, one must seriously consider the Defendant's assertion that the Contract either clearly favors the legality of what the Defendants did, or that the Contract and the regulations are so terribly ambiguous that what was done did not constitute a crime. This claim touches fundamental principles of legality. Those principles support numerous rules of law.

At perhaps the deepest level, it can be said that law itself is a teleological endeavor, and that its purpose is to guide people as they go about their daily activities. As such, the law should be clear and understandable, for how can people follow its dictates if it is not? If you take away that clarity to a sufficient extent, it is proper to question whether you are dealing with law at all, as opposed to raw power. In that regard, *see*, Lon J. Fuller, *The Morality of Law*, (Yale University Press, 1964).

This principle supports the view stated by Justice Holmes in *McBoyle v. United States*, 283 U.S. 25, 27, 51 S.Ct. 340, 341, 75 L.Ed. 816 (1931). That is: "[I]t is reasonable that a fair warning should be given to the world in language that the common world will understand, of what the law intends to do if a certain line is passed. To make the warning fair, so far as possible the line should be clear."

The same principle supports the long standing rule that ambiguity in criminal statutes should be resolved in favor of lenity. *See, e.g., Bell v. United States*, 349 U.S. 81, 83–4; 75 S.Ct. 620, 622, 99 L.Ed. 905 (1955). *See, also, Rewis v. United States*, 401 U.S. 808, 91 S.Ct. 1056, 28 L.Ed.2d 493 (1971).

The principle further supports the oft expressed view that an individual cannot be found to have the intent to violate a vague or highly debatable law, *United States v. Mallas*, 762 F.2d 361 (4th Cir.1985), and that if "no statute, regulation, or court decision gave fair warning" it would be a violation of the fifth amendment to the

United States Constitution to permit a prosecution. *United States v. Dahlstrom*, 713 F.2d 1423, 1429 (9th Cir.1983). As the Court of Appeals suggested in *United States v. Critzer*, 498 F.2d 1160, 1164 (4th Cir.1974), a criminal prosecution is not the place to decide pioneering interpretations of the law.

Finally, and directly applicable to the case at hand, this salutary principle of legality undergirds the decision in *United States v. Race*, 632 F.2d 1114 (4th Cir. 1980). There the Court pointed out that a prosecution for making false statements could not be founded on an ambiguous contract. It is worth noting that the Court first found that the contract clearly authorized what the defendants did, and then opined that the district court should have dismissed the matter. It went on to state that even if the contract were ambiguous, that is "susceptible of at least two reasonable constructions," the defendants could not, as a matter of law, be found guilty of making a false statement. *United States v. Race, supra*, at 1120. That was because the Government could not possibly sustain its burden of proving knowing and willful submission of false statements beyond a reasonable doubt. As the Court said:

> [W]henever a defendant's statement or action under a contract accords with a reasonable construction of the enabling language of the contract, the Government will not have carried its burden of "negativ[ing] any reasonable interpretation that would make the defendant's statement factually correct" and thus a conviction under Section 1001 cannot stand under those circumstances. *United States v. Race, supra*, at 1120.

The Court of Appeals even went on to comment that the defendants' good faith would not be an issue. As it said, what the defendants thought was beside the point, since their thoughts would become important "if, but only if, the billing was false, that is, was not within the reasonable construction of the contract." *United States v. Race, supra*, at 1120.[1]

Armed with this background, the Court must now turn to the contract at hand. When that is done, the Court is struck with the apparent peculiarity of the Contract's language. It is designated as a firm fixed-price (best efforts) contract. (Paragraph E. 2) Under the heading "Objective" the Contract indicates that the contractor will "provide his best efforts, manpower, resources, and facilities, to design, develop and deliver the DIVAD Gun System...." (Paragraph F. 1 I-a) Similar language appears in other places.

It is true that the Grand Jury dropped the "best efforts" language from the indictment, and thus either avoided the necessity of wrestling with the issue now confronting the Court, or chose to construe the Contract as though that language did not appear, or both. That, of course, points to the fact that the Court's concern about an indictment that fails to reflect the specific terms of the Contract upon which it is based is not an entirely unwarranted concern.

If this Court felt certain that the Contract included "no words of art, but only words of common understanding and use" then it may well feel constrained to hold that the Contract is so ambiguous and so susceptible of differing reasonable interpretations that the indictment should be dismissed at this time, unless the actions of the Defendant's in allocating funds to the B & P or IR & D accounts could not be supported under any of those interpretations. *United States v. Race, supra*, at 1119. The Court is not in a position to make any such declaration.

The word "ambiguous" is not itself free from ambiguity. Surely one cannot decide ambiguity in a vacuum. What appears problematic to an outsider may seem perfectly clear to a cognoscente of the area in ques-

---

**1.** One district court has suggested that this reasoning as to substantive counts may not apply in a conspiracy case, but the reason for so stating is not clear, and perhaps that suggestion was not intended. *United States v. LaBar*, 521 F.Supp. 203, 216 (M.D.Pa.1981), *affirmed*, 688 F.2d 826 (3d Cir.1982), *cert. denied*, 459 U.S. 945, 103 S.Ct. 260, 74 L.Ed.2d 202 (1982).

tion. Perhaps there truly is no lack of clarity in the Contract to one who is expert or otherwise familiar with the words, laws and regulations that pervade the area of military contracting. Given that situation, this Court is unable to say that the Contract is clearly one for best efforts or clearly a firm fixed-price contract or clearly some kind of hybrid. Nor is it able to say at this juncture that its own feeling that the Contract is vague and ambiguous is a valid one. It may well be that an expert would see that the demands of this Contract and the rules and regulations which control charges to it, to B & P and to IR & D are so pellucid that there could be no doubt about their meaning or intent.

Therefore, even if there are instances when a Rule 12(b) motion of this type should be granted, and the Court thinks that there are, it would be improper to grant the motion to dismiss at this time, and the motion will be denied without prejudice.[2]

### B. The Primary Jurisdiction Motion.

■ The suggestion that this Court refer the basic issue of proper construction of the Contract to the ASBCA is a most intriguing one. As far as the Court has been able to ascertain, there is no prior published case where a district court has referred issues to the ASBCA, although there is authority for the proposition that bankruptcy courts should defer to boards of contract appeals in certain instances. *Gary Aircraft Corp. v. United States (In Re Gary Aircraft Corp.),* 698 F.2d 775 (5th Cir.1983). Therefore, a brief review of the contours of the doctrine of primary jurisdiction would seem to be appropriate.

The genesis of the doctrine is found in *Texas and Pacific Ry. Co. v. Abilene Cot-ton Oil Co.,* 204 U.S. 426, 27 S.Ct. 350, 51 L.Ed. 553 (1907). Like other rules, which are designed to harmonize overlapping jurisdictional demands and to promote uniformity and basic fairness,[3] this doctrine has evolved as a means of preventing clashes between duties imposed upon citizens by administrative tribunals and those imposed by the courts. As the Supreme Court explained in *United States v. Western Pacific R.R. Co.,* 352 U.S. 59, 63–64; 77 S.Ct. 161, 165, 1 L.Ed.2d 126 (1956):

"Primary jurisdiction" ... applies where a claim is originally cognizable in the courts, and comes into play whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body; in such a case the judicial process is suspended pending referral of such issues to the administrative body for its views.

A further explanation of the doctrine appears in *Far East Conference v. United States,* 342 U.S. 570, 72 S.Ct. 492, 494, 96 L.Ed. 576 (1952) where the court noted that primary jurisdiction is:

[A] principle, now firmly established, that in cases raising issues of fact not within the conventional experience of judges or cases requiring the exercise of administrative discretion, agencies created by Congress for regulating this subject matter should not be passed over. This is so even though the facts after they have been appraised by specialized competence serve as a premise for legal consequences to be judicially defined. Uniformity and consistency in the regulation of business entrusted to a particular agency are secured, and the limited functions of review by the judiciary are more rationally exercised, by preliminary re-

---

**2.** There is authority to the effect that such a motion should not be granted until after evidence is taken. *United States v. Computer Sciences Corp.,* 511 F.Supp. 1125, 1136 (E.D.Va. 1981), *reversed on other grounds,* 689 F.2d 1181 (4th Cir.1982).

**3.** Exhaustion of administrative remedies, exhaustion of state remedies in habeas corpus cases, and various abstention doctrines all have this as at least a part of their purpose. For example, the factors to be used in deciding a case involving *Pullman* abstention are remarkably similar to those in this area. *See, Railroad Comm'n v. Pullman Co.,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941); and *Kollsman v. City of Los Angeles,* 737 F.2d 830, 833 (9th Cir.1984).

sort for ascertaining and interpreting the circumstances underlying legal issues to agencies that are better equipped than courts by specialization, by insight gained through experience, and by more flexible procedure.

Although it is true that there is no particular formula to be used in deciding when to apply the doctrine of primary jurisdiction, four principal factors have been identified. Those factors are: whether the question is within the conventional experience of judges; whether the question lies peculiarly within the agency's discretion or requires the exercise of the agency's expertise; whether there exists a danger of inconsistent rulings; and whether a prior application to the agency has been made. *See, Oasis Petroleum Corp. v. U.S. Dept. of Energy*, 718 F.2d 1558, 1564 (Temp. Emer.Ct.App.1983), and *In Re Long Distance Telecommunication Litigation*, 612 F.Supp. 892, 893–94 (E.D.Mich.1985).

It should also be noted that although the doctrine originally developed in cases involving some of the more traditional administrative agencies, it has not been confined to those. Rather, it has expanded to include virtually any case whose consideration lies within the competence of an administrative body. *See, e.g.,* the cases cited in *Oasis Petroleum Corp. v. U.S. Dept. of Energy, supra,* at 1563–64; *National Republican Congressional Committee v. Legi-Tech Corp.*, 795 F.2d 190 (D.C.Cir. 1986) (deferral of a copyright matter to the Federal Election Commission); and *Allegheny Electric Cooperative, Inc. v. Power Authority*, 630 F.Supp. 1271 (S.D.N.Y. 1986) (deferral to the Federal Energy Regulatory Commission). That should not come as a surprise, for in our increasingly complex society we find more and more pockets of specialization. At the same time, the demands upon the federal court system have greatly increased over the years. That has resulted in a significant reduction in the ability of any one judge to properly resolve technical issues by simply using common knowledge and experience. That has also resulted in a tendency to change from a rule that both agency exper-

tise and the need for uniformity are required to a rule that either one will suffice. Compare, *Locust Cartage Co. v. Transamerican Freight Lines, Inc.*, 430 F.2d 334, 340 n. 5 (1st Cir.1970), *with In Re Department of Energy Stripper Well Litigation*, 578 F.Supp. 586, 596 (D.Kan.1983), and *Skoller v. Blue Cross*, 584 F.Supp. 288, 290 (S.D.N.Y.1984).

The possibility that this doctrine could be applied in criminal cases has been recognized for many years. *See, United States v. Alaska S.S. Co.*, 110 F.Supp. 104 (W.D. Wash.1952). While that application was often refused [*e.g., In Re Grand Jury Investigation*, 186 F.Supp. 298 (D.D.C.1960), and *United States v. Castner*, 116 F.Supp. 475 (N.D.Ill.1953) ], the Ninth Circuit has now declared that criminal prosecutions should not be excluded from the doctrine's operation. *United States v. Yellow Freight System, Inc.*, 762 F.2d 737 (9th Cir.1985). In fact, that Court has stated that a failure to refer a properly referable case will result in the reversal of a conviction.

This development is not too surprising. Why should a defendant in a criminal case, and the court before whom the defendant must appear, be deprived of the expertise and clarification of the law and regulations that would be available in a civil case? Surely the need for basic fairness and for uniformity of decision is as strong in criminal prosecutions as it is in civil cases. Surely the judge should have the best information possible when he makes rulings in the criminal law area.

In deciding the question of referral, the Court must first consider the nature of the ASBCA, and the industry to which it relates. That must be an important part of any decision.

The defense industry in this country is highly regulated. In fact, as one commentator has noted, it is " ... essentially ... totally regulated." Jacques S. Gansler, *The Defense Industry* 258 (1980). It is well known that a large portion of the Government's annual budget is spent on defense. So, through its power over the

purse, the Government has acquired detailed control over the actions of its contractors. It has done so through webs of laws, regulations, and directives, that can almost defy understanding as they descend to the smallest details, and ascend to the most grandiose plans. As Gansler put it in *The Defense Industry, supra,* at pg. 5, "the Department of Defense is the regulator, the specifier of new products, the 'banker', the judge of claims, and almost the sole buyer."

Government regulation of the defense industry proceeds through contracts laced with specialized provisions and jargon, sets of military specifications, regulations, on the spot inspections, management systems, review committees, contracting officers, and a myriad of other devices, all of which are designed to assure the ultimate protection of the national interests, both technologically and economically.

The desire, if not the need, for detailed controls has generated a situation in which contracts are linked to specifications and regulations in a reticulated manner that makes it almost impossible to consider one without the other. The resulting documents bear little or no resemblance to the usual picture that one conjures up when the word "contract" is heard. In this case, for example, the Contract takes up several feet of shelf space, and is filled with special usage words. Even the seemingly simple description of it as a firm fixed-price (best efforts) contract turns out to be loaded with non-obvious meanings.

Faced with such an infrangible mass, even if a Court were able to read and understand the words in a contract like the one involved here, it would have made little headway toward reasoned analysis. It would also have to master the various regulations that are incorporated into or that otherwise guide a proper interpretation. Beyond that, if the contract were reasonably subject to more than one interpretation, mastery of the rules that would apply to each construction of it would be required. Then to truly clear away the brume, the Court would have to look to the ASBCA's own constructions of those very regulations.

Only an extreme case of hubris could convince a district judge that all of this was simply within his conventional experience, and only a gross form of pertinacity would cause him to cling to that opinion once he had been given the opportunity for enlightenment.

This strongly suggested the need for a specialized body whose focus would be defense contracts and regulations. That need was manifest for years and the ASBCA is an outgrowth of it.

The Board finds its historical roots in joint directives within DOD, and is now provided for by statute. *See,* 41 U.S.C. Section 607. The Supreme Court alluded to the Board's function in *United States v. Utah Construction and Mining Co.,* 384 U.S. 394, 421 n. 18, 86 S.Ct. 1545, 1559 n. 18, 16 L.Ed.2d 642 (1966), where it quoted the following language with approval: "[C]ongress intended the boards ... to be *the* fact-finders within their contract area of competence, just as the Interstate Commerce Commission, the Federal Trade Commission, and the National Labor Relations Board are *the* fact-finders for other purposes."

The Court of Appeals for the Fifth Circuit put it even more graphically when it stated:

> Boards of Contract Appeals were created precisely because of the needs for expertise, speed, and uniformity in resolving government contract disputes. One cannot help but think that the ASBCA might have been better qualified by its experience and expertise to resolve the present case than was a bankruptcy judge who was at one stroke forced to master government contracting law. *Gary Aircraft Corp. v. United States (In re Gary Aircraft Corp.),* 698 F.2d 775, 784 (5th Cir.1983).

Considering its historical origin and its expertise, it is not amazing to find that the ASBCA plays a significant role in the military procurement process. One does not

marvel to hear that the military agencies closely monitor the handling of disputes before the Board, and that "DOD makes changes to bring its acquisition system into compliance with Board decisions." *See,* G.A.O. Report NSIAD 85–102, entitled *The Armed Services Board of Contract Appeals Has Operated Independently,* page 25 (September 23, 1985). Thus, the interpretations of the hierophants who man the ASBCA do, indeed, form an important part of the whole scheme of regulation of the defense industry.

Therefore, while it is true that when taken by itself the ASBCA does not necessarily operate in the same fashion as the more traditional administrative agencies, it is certainly embedded in and even rather central to the operation of defense procurement. It performs traditional agency functions. It brings a highly honed and respected expertise to bear on this technical area, and makes authoritative determinations which have the effect of explaining and setting DOD policy for the defense industry.

Nor would the mere fact that a party must bring the matter to the Board before it will take action change the situation. That kind of problem was dealt with by the Court of Appeals in *Israel v. Baxter Laboratories, Inc.,* 466 F.2d 272 (D.C.Cir.1972). There the Court simply indicated that the matter could be referred once the party did activate the process before the administrative agency.

Absent the use of the ASBCA in an area like the one now before the Court, there may well be significant chaos in the defense industry. The possibility that various district judges throughout the country would construe defense contracts and regulations in different ways could lead to a great lack of uniformity in an area that should be free of that sort of uncertainty.[4]

The last major factor is a consideration of whether a prior application has been made to the agency. The Government properly notes that General Dynamics did make an application, and that the agency declined to exercise jurisdiction at that time. It did so in ASBCA Case No. 32297. However, a review of that decision shows that it did so for two reasons.

First, the contracting officer had not yet made a decision. The Court notes that on March 10, 1986, the Board ordered that officer to make a decision within 60 days of receipt of the contractor's claims, or state why a decision could not issue within the 60 days and indicate when a decision would be issued. The Court has been informed by defendants (and this is not disputed) that the contracting officer has refused to make a decision, because of the fact that this case is presently pending in this Court. It would, therefore, appear that for practical purposes a decision has been made, although it was a decision not to decide. Pursuant to the Board's own order, that impediment to its jurisdiction appears to have been removed.

The second reason was that this criminal case was already pending. The Board was of the opinion that it should not assume jurisdiction by deciding for itself that the primary jurisdiction doctrine applied. Rather, it said, "applicability of the doctrine is a matter for decision by the U.S. District Court...." Now that this Court has made that decision, the Board may well be prepared to decide the issues in question. If the Board is still not willing to proceed, it will be a simple, and not very time consuming, matter for it to so state, in which event this case will move forward.

4. The Court, of course, recognizes that the Claims Court is another avenue for the consideration of these cases. But use of that Court is relatively infrequent, and that use would not, in any event, raise the spectre of confusion that use of a multiplicity of district courts would. The very fact that it is *the* alternative underscores some of the points being made here. In fact, it would seem rather peculiar to hold that civil cases must go to the ASBCA or the Claims Court, so that this area of law will benefit from the advantages of expertise and uniformity, while criminal cases, where those advantages are just as important, must entirely bypass those fora.

All of this strongly militates in favor of a referral to the Board, but the Government has raised some issues which require discussion.

First, the Government argues that referral would be futile, because the decision of the ASBCA will not bind this Court. It is true that the Board's decision will not decide this criminal fraud case. Still, the decision need not be binding in that sense, if it would constitute a material aid in resolving this case. *Ricci v. Chicago Mercantile Exchange*, 409 U.S. 289, 302–05, 93 S.Ct. 573, 580–82, 34 L.Ed.2d 525 (1973). Here a determination by the Board "can do nothing but assist the Court in reaching the appropriate result." *Jacksonville Maritime Ass'n v. City of Jacksonville*, 551 F.Supp. 1130, 1135 (M.D.Fla.1982).

The Contract and the proper interpretation of the regulations that apply to it are matters central to this case. The Court has already noted that the Contract appears to be ambiguous on its face, but that it may or may not be. Moreover, the regulations that guide payment of expenses from B & P and IR & D funds do not clearly indicate whether payment would be proper in the context of a best efforts contract, or in the context of a firm fixed-price (best efforts) contract. These sorts of issues are at the core of what the ASBCA is designed to adjudicate. At the same time, they lie at the core of this prosecution.

If under every proper construction of the Contract, the regulations preclude charging of expenses related to or required by it to the B & P or IR & D accounts, then that has a profound effect on the issues facing this Court and on the defense industry. On the other hand, if under the proper construction of the Contract and the regulations, it is clear that it was proper to charge the expenses here exactly the way they were charged, the effect on this indictment would be most devastating. That is, if the Government's theory of the proper manner to charge DIVAD expenses pursuant to the regulations is wrong, then it would be quite problematic to state that

substantive offenses were committed when the records showing that the expenses were so charged were submitted to the DOD. Moreover, we would then have to deal with the argument that the defendants had constructed a conspiracy to do acts that were not truly wrong at all. This, of course, raises the whole spectre of whether there can be a criminal conspiracy to do that which is not criminal or fraudulent in the first place. *Cf.*, Fletcher, *Constructing a Theory of Impossible Attempts*, 5 Crim. Justice Ethics 53 (Winter/Spring 1986), which discusses a somewhat related area.

The Board may, however, decide that the Contract is ambiguous, even when its terms are viewed from the standpoint of the experts who must interpret and apply the regulations and rules that support defense contracting. Under one proper interpretation, the regulations may prohibit the use of B & P or IR & D funds, and under another the regulations may permit that use. That, too, could have serious implications in light of *United States v. Race, supra*.

In other words, the decision of the ASBCA on the proper construction of the regulations and the proper meaning of the language of the Contract, may well resolve issues that will allow this Court to dispose of all or a major portion of the case before it. Even if the Board's determinations do not result in a resolution of the criminal case itself, those determinations will surely aid the Court in the admission of evidence, consideration of motions for judgment of acquittal under Rule 29 of the Federal Rules of Criminal Procedure, and instruction of the jury on the law that it will have to apply in deciding the case.

Next, the Government asserts that this is a fraud case and that pursuant to 41 U.S.C. Section 605(a), the Board cannot decide it at all. However, the Board will not be asked to decide fraud issues, but need only rule on the meaning of the Contract and the regulations. It cannot be gainsaid that if the Contract and the applicable regulations allowed for the precise charging done here,

an award to General Dynamics would be proper. On the other hand, if it did not, the Board would make no such award. It is true that in the first instance it would also be difficult for a Court to find that fraud existed, but that does not mean that the Board would have decided the fraud issue, any more than a decision in any case which results in issue preclusion in another case can be said to have decided the other case. Nor will a determination that it was improper to make the charges in question decide the fraud issue, because the issue of fraud will still remain before this Court. Thus, the fact that the Board cannot make a decision on whether fraud exists will not preclude this referral. *See, Time Contractors Joint Venture,* DOT CAB Nos. 1669, 1691, 86–2 BCA (CCH) Paragraph 19,003 (May 15, 1986), *M & M Services, Inc.* ASBCA No. 28712, 84–2 BCA (CCH) Paragraph 17,405 (April 19, 1984), and *Beaves, dba Commercial Marine Services,* DOT CAB Nos. 1160, 1324, 83–2 BCA (CCH) Paragraph 16,648 (July 6, 1983).

The Government also asserts that the Board will take too long to reach a decision in this case. That is certainly a consideration in any primary jurisdiction referral. *See, e.g., Rohr Industries, Inc. v. Washington Metropolitan Area Transit Authority,* 720 F.2d 1319 (D.C.Cir.1983), where the Court indicated that there had been a rather egregious delay at the administrative level. Then, too, this is a criminal prosecution and care must be taken to see that it is not delayed excessively. *United States v. Yellow Freight System, Inc.,* 762 F.2d 737, 741 (9th Cir.1985). That policy is certainly expressed in the speedy trial laws. 18 U.S.C. Section 3161 et seq.[5] Nonetheless, justice is as important as speed, and this is not an ordinary criminal prosecution by any means. In any event, this Court will retain authority to terminate the referral if that becomes necessary.

Finally, the Government argues that a referral will frustrate its ability to prosecute other fraud cases. Even if this Court should consider that kind of consequentialist argument, it rather doubts that the reality will live up to the Government's fears. It is doubtful that there will be a plethora of cases like this one. If there is, and if they are founded upon complex and apparently unclear contracts and regulations, one would think that courts should unblinkingly continue to ask for the aid of the expert agencies. Moreover, the Government's real concern seems to be with the implications of *United States v. Yellow Freight System Inc., supra,* but this is not the forum that should address and answer that concern.

This case touches upon important issues in the area of defense procurement. Those issues involve nice questions about the proper construction of contracts and regulations. Those questions, in turn, call for expert consideration and uniform answers. Since the ASBCA is uniquely qualified to supply the needed answers, certain issues will be referred to it.

**C. Questions to be referred to the ASBCA.**

Once it is decided that issues should be referred, it becomes the Court's duty to frame its questions with some care. On the one hand, it is improper to submit a question which is so narrow that the views of the Board are unduly restricted. *Oasis Petroleum Corp. v. U.S. Department of Energy,* 718 F.2d 1558, 1566 (Temp.Emer. Ct.App.1983). On the other hand, the Court should not simply send some broad and amorphous question to the Board. *Mississippi Power and Light Co. v. United Gas Pipe Line Co.,* 532 F.2d 412, 421 (5th Cir.1976).

Therefore, the Court has determined that it will refer the following questions to the Board:[6]

---

**5.** The Court has determined that the ends of justice require that there be excludable time so that this referral can be made.

**6.** However, the parties have been invited to comment on this list, and changes may be made by the Court after it has heard those comments.

(1) Is the nature of the Contract, which is designated as a firm fixed-price (best efforts) contract, ambiguous in the sense that it can reasonably be construed in more than one way? What are the possible ways?

(2) Is the nature of the Contract clearly a firm fixed-price contract, or clearly a best efforts contract, or clearly another type of contract—a hybrid of some kind? What type of contract is it?

(3) Considering the type of contract involved here, was the contractor required to spend any more than the contract price itself toward the accomplishment of the objectives of the Contract?

(4) If the contractor was not required to spend amounts above the contract price toward accomplishment of the objectives of the Contract, do the regulations governing charges to B & P and IR & D permit the charging of additional amounts expended to accomplish the objectives of the Contract to those accounts?

(5) If considering the type of contract this was, no expenditures over the Contract price to accomplish the objectives of the Contract were "required", would it have been improper to expend B & P or IR & D funds to accomplish some or all of those objectives?

(6) If the Contract is ambiguous (see first question) would it have been proper to charge any of the expenses which would accomplish the objectives of the Contract to B & P or IR & D under any of the reasonable constructions of its terms? Which ones?

(7) Do the regulations regarding the proper charging of expenses clearly require the above answers, or is further construction of the regulations required?

(8) Considering the type of contract this was, would it have been proper to charge expenses "related to" the work performed under the Contract, although not necessarily "required by it," to the B & P and IR & D accounts?

(9) Considering the type of contract this was: What was the contractor required to do under the Contract? Was performance of work in excess of the contract price required? Could the Contract reasonably be construed to limit the obligation to the contract price?

(10) If any of the questions are overlapping the Court would be pleased to have cross-references rather than repetitive answers. In addition, the Court does not intend to unduly limit this referral, so if other questions can and should be posed and answered, the Court would be pleased to receive that information from the Board. Furthermore, if the Board is unable to answer certain questions, it should simply so state.

## III.  CONCLUSION

The Court DENIES the Motion to Dismiss for Failure to State an Offense, without prejudice.

However, the Court GRANTS the Motion to Defer to the ASBCA, refers certain questions to it at this time, and orders that all proceedings in this case be stayed pending action by that Board. The Court notes that the stay will not become fully effective until the Defendant, General Dynamics, reapplies for consideration of this matter by the Board. *See, Israel v. Baxter Laboratories, Inc.*, 466 F.2d 272 (D.C.Cir.1972).[7]

---

7.  The Court has been informed that the application was made on September 24, 1986.