UNITED STATES of America

v.

Thomas J. D'ALESSIO and Joseph Thor, Defendants.

Crim. No. 92–573 (HLS).

United States District Court, D. New Jersey.

June 2, 1993.

Kimberly A. McFadden, James B. Nobile, Asst. U.S. Attys., Office of U.S. Atty., Newark, NJ, for U.S.

Michael Critchley, West Orange, NJ, Samuel J. Buffone, Peter M. Brody, Ropes & Gray, Washington, DC, for defendant Thomas J. D'Alessio.

Michael D'Alessio, Jr., West Orange, NJ, for defendant Joseph Thor.

Howard S. Wilson, Atco, NJ, for Sheriffs' Ass'n of NJ.

## OPINION

SAROKIN, District Judge.

*Introduction*

One would consider it a given that the solicitation of private gifts by a public official would be a crime; and certainly that a misrepresentation as to the purpose of those gifts would make it more so. There can be little doubt that soliciting funds purportedly for campaign purposes with the intent of using them personally is a fraud—and using the mails for that purpose is mail fraud. But surprisingly the first premise is not so clear. Apparently, there are circumstances in New Jersey under which neither the solicitation nor the receipt of a gift by a public official is a crime.

The defendants in this matter, Thomas J. D'Alessio and Joseph Thor, have moved to dismiss counts one through five of the indictment against them, in part because the grand jury was advised by the government that defendant D'Alessio, as a county sheriff, was prohibited by court rule from soliciting and receiving personal gifts. It is unclear (but probably doubtful) that the rule applies to sheriffs. The uncertainty renders it an inappropriate basis for criminal charges. Although there are other independent bases to sustain the charges, the court cannot ascertain the extent to which reliance on the rule

motivated the grand jury's decision to indict these defendants. The court cannot speculate as to what the grand jury would have done absent reliance on the subject rule. That answer can only be derived by resubmission of the matter to a grand jury, if the United States Attorney chooses to do so, without reference to or reliance upon the rule.

By this decision, the court makes no finding and reaches no conclusion as to the lawfulness of the conduct charged. Rather, the court concludes only that the court rule presented to the grand jury was not clearly imposed upon defendant D'Alessio so as to sufficiently inform him that its violation would provide the basis for criminal charges. Therefore, the inclusion of this rule in the grand jury's consideration and indictment is improper as a matter of law.

Defendants have also moved to dismiss count six of the indictment on the basis that it incorporates a regulation which was improperly promulgated by a New Jersey administrative body. The regulation in question prohibits the use of political funds for private purposes. Until recently, the legislature charged with the authority and responsibility for enacting such a prohibition refused and failed to do so, while the agency which promulgated the regulation probably lacked the authority to do so.

If there are to be restrictions on gifts to public officials and the use of campaign funds, they should be enacted with precision by those who have the obligation and power to do so. Otherwise, the acceptance of such gifts and the use of such money, no matter how offensive to common sense and public morality, cannot constitute a crime punishable by imprisonment.

While ignorance of the law ordinarily is not an excuse or defense to criminal charges, one should be able to ascertain the law through reasonable inquiry and determine its scope and applicability. Persons should not be subject to criminal charges and potential punishment based upon rules and regulations which are ambiguous in their content or doubtful in their legitimacy. The court makes no determination as to the defendants' guilt or innocence or the propriety of their conduct. It merely imposes the traditional requirement upon the Government that, before a person can be charged with a crime, he or she is entitled to fair warning that the conduct which forms the basis of an indictment is prohibited, and that the source of such prohibition has the authority to enact it.

*Background*

Defendant Thomas J. D'Alessio ("D'Alessio") served as Sheriff of Essex County in New Jersey from January 1, 1983 to November of 1990. On November 6, 1990, he was elected to the position of County Executive for the County of Essex, New Jersey, which he holds to date. Defendant Joseph Thor ("Thor") is an attorney admitted to practice in the State of New Jersey. He has served as the treasurer of fundraising events sponsored on behalf of D'Alessio since 1982 and continuing to the present date. He specifically served as Campaign Treasurer for D'Alessio's campaign to become Essex County Executive. Thor also provided legal services to D'Alessio while he was in office. James D'Alessio, who is involved in this case as an unindicted co-schemer, is D'Alessio's father.

On October 7, 1992, a federal grand jury sitting in Newark, New Jersey returned a six count indictment against D'Alessio and Thor. The first three counts of the indictment charge defendants with mail fraud, in violation of 18 U.S.C. §§ 1341 and 1342. The indictment states that D'Alessio and Thor arranged for a dinner to be held in honor of D'Alessio on March 29, 1989, and that between January 31, 1989 and March 29, 1989, D'Alessio and Thor mailed invitations and tickets which sought a $100 contribution per ticket to citizens, residents, and taxpayers of Essex County and elsewhere. More specifically, count one charges that defendants mailed thirty invitations and tickets to companies which thereafter contributed; count two charges that defendants mailed eleven invitations and tickets to attorneys who later contributed; and count three charges that defendants mailed sixteen invitations and tickets to other taxpayers, citizens, and residents of Essex County and elsewhere who later contributed.

The three counts together charge that defendants did not disclose in the invitation or

the tickets to the March 1989 fundraiser that contributed funds would be used as gifts for the personal benefit of D'Alessio and his father. The indictment alleges that defendants instead caused the invitation and tickets to be drafted in such a way so as to mislead contributors into believing that the funds would be used for D'Alessio's campaign and political purposes. The indictment states that invitees contributed at least $82,500 to the March 1989 fundraiser, which Thor deposited into a bank account under the name of "Friends of Tom D'Alessio" maintained at Broad National Bank in Newark, New Jersey. Counts one through three further state that after a local newspaper reported on the existence of the grand jury subpoenas issued in this matter, defendants attempted to conceal their scheme to defraud by returning $180,995.54 to the "Friends of Tom D'Alessio" bank account.

Counts four and five charge defendants with money laundering and aiding and abetting, in violation of 18 U.S.C. § 1956(a)(1)(B)(i) and 18 U.S.C. § 2. Count four states that on December 28, 1988, defendant Thor, James D'Alessio and others, acting through a collective partnership called the "Rossmore Place Associates," purchased certain real property in Belleville, New Jersey known as the "Rossmore Property." Count four asserts that this purchase was funded in part by a $100,000 loan obtained by James D'Alessio from the Broad National Bank in Newark, New Jersey ("the Rossmore Place Loan"), and that D'Alessio was the guarantor for this transaction. Count four alleges that on April 29, 1989, under the guise of making a loan, Thor issued a check to James D'Alessio in the amount of $50,000 from the "Friends of Tom D'Alessio" bank account and that this money was thereafter used to reduce the Rossmore Place Loan. Count four charges that this transaction was designed in whole or in part to conceal and disguise the nature, source, ownership and control of the proceeds from the March 1989 fundraiser.

Count five charges that on August 11, 1989, D'Alessio and James D'Alessio, acting through a joint partnership called the "Hilton Street Associates," purchased an interest in

Gloria Lane Industrial Partners, Ltd., a partnership with real estate holdings in Fairfield, New Jersey. Count five asserts that this purchase was funded in part by a "loan" in the form of a $25,000 check given to James D'Alessio on July 25, 1989 from the "Friends of Tom D'Alessio" bank account by defendant Thor.[1] Count five charges that this "loan" was designed in whole or in part to conceal and disguise the nature, source, ownership and control of the proceeds from the March 1989 fundraiser. Both counts four and five seek forfeiture of funds and assets owned by D'Alessio, Thor, and James D'Alessio, including currency in the "Friends of Tom D'Alessio" bank account and property held by Rossmore Place Associates and Gloria Lane Industrial Partners, Ltd.

The last count of the indictment was superseded and amended by an indictment returned February 3, 1993. It is unrelated to the March 1989 fundraiser. Count six charges defendants with mail fraud, in violation of 18 U.S.C. §§ 1341 and 1342. Count six alleges that following D'Alessio's November 1990 election to the office of County Executive, he vacationed in Aruba for seven days with a friend and used campaign funds to pay for his vacation expenses. Count six states that in January of 1991, Thor caused a check for $4,500.46 to be drawn from D'Alessio's County Executive campaign fund and sent to the American Express Company as payment, in part, of D'Alessio's vacation expenses. Count six also alleges that defendants falsely reported this disbursement to the New Jersey Election Law Enforcement Commission as a "car rental" expense. Count six charges that these actions constituted a scheme to obtain, divert and embezzle money and other things of value from D'Alessio's County Executive campaign fund; to convert such money to D'Alessio's personal use, enjoyment, and benefit; and to conceal such diversion and embezzlement.

Defendants made their initial appearance before this court on October 20, 1992. The court set bail and issued a discovery order. Defendants now move to dismiss all counts of the indictment.

---

1. Counts four and five also state that Thor prepared the agreements that formed both the Rossmore Place Associates partnership and the Hilton Street Associates partnership.

*Discussion*

### I. Defendants' Motion to Dismiss Counts One Through Five

#### A. The Indictment

Defendants' attack on the indictment centers first on the facial validity of counts one through three and the sufficiency of the evidence supporting them. A close examination of the exact wording of these counts is necessary to the court's analysis. Counts one through three are collectively stated with the exception noted previously that each count refers to a different group of invitees. The first paragraph of these counts identifies the defendants and sets forth in two subparagraphs the "Duties of a Sheriff." Specifically, paragraphs 1(e) and 1(f) state as follows:

e. As the Sheriff of Essex County, the defendant Thomas D'Alessio, had a duty, imposed by New Jersey State Statute 40A:9–96 and other laws and regulations, to "faithfully, impartially and justly" perform all the duties of his office, including, among other things, to serve as an officer of the Courts of Essex County, New Jersey in the assignment and supervision of Court personnel and attendants, and in the service and execution of writs, warrants and other court process.[2]

f. As the Sheriff of Essex County and an officer of its courts, the defendant Thomas J. D'Alessio, also had a duty, imposed by Rule 1:16–2 of the Rules Governing the Courts of the State of New Jersey, not to accept any personal gratuity or personal gift either directly or indirectly from any attorney or other person who has had or is likely to have any professional or official transaction with the Sheriff in his capacity as an officer of the courts of Essex County.

The Rules, however, do not preclude the Sheriff from soliciting and accepting political and campaign contributions.[3]

Paragraphs 2 and 3 of the indictment then proceed to relate the central basis for the mail fraud charges. These paragraphs state as follows:

2. From at least October 1988 and continuing through the date of the filing of this Indictment, in Essex County in the District of New Jersey and elsewhere, the defendants Thomas J. D'Alessio and Joseph Thor knowingly, willfully and unlawfully did devise and intend to devise a scheme and artifice to defraud:

a. contributors to a fundraising event sponsored by the defendants of money and property; and

b. taxpayers, citizens and residents of Essex County and elsewhere, of their right to the honest and faithful services of their elected officials, including, specifically, Sheriffs,

by means of false and fraudulent pretenses, representations, and promises.

3. The object of this scheme and artifice to defraud was to obtain money and other things of value for the defendant Thomas J. D'Alessio and his father, James D'Alessio in the following manner:

a. by inducing taxpayers, citizens and residents of Essex County and elsewhere to contribute to a fundraising event through the deliberate failure to disclose that the funds would be used as gifts for the personal benefit of the defendant Thomas J. D'Alessio and his father, James D'Alessio, rather than for political and campaign expenses; and

b. by deceiving attorneys and others into giving gratuities and gifts to an officer of

---

**2.** N.J.Stat.Ann. § 40A:9–96 provides the sheriff's oath of office and states as follows:

Every person elected or appointed to the office of sheriff, before entering upon the duties of his office, shall take the following oath:

"I, _____, sheriff of the county of _____ (insert name of county) do solemnly swear (or affirm) to support the Constitution of this State and of the United States and perform the duties of my office as sheriff, faithfully, impartially and justly to the best of my ability."

**3.** Rule 1:16–2 of the Rules Governing the Courts of the State of New Jersey provides as follows:

No attorney or party shall give either directly or indirectly any gratuity or gift to any employee of any court, or of any officer serving a court, or of any other governmental agency or officer, where such attorney has had or is likely to have any professional or official transaction with such court, office or agency; nor shall an employee of any court, or of any office serving a court, accept any gratuity or gift either directly or indirectly from any attorney or other person who has had or is likely to have any professional or official transaction with such court or office.

the court in violation of the Rules of the Courts of the State of New Jersey through the deliberate failure to disclose that such funds would be used as gifts for the personal benefit of the defendant Thomas J. D'Alessio and his father, James D'Alessio, rather than for political and campaign expenses.

In its briefs submitted to this court, the Government explains that counts one through three allege a two-part fraud. First, the indictment charges "a classic fraud based on a tangible rights theory—the defendants obtained money from their victims by leading them to believe that their money would be used for political purposes, when, in fact, the money was used for private enrichment." Govt.Mem. at 11. The Government states that "[s]econd, and independently, the Indictment charges that the public was defrauded of its nonpecuniary, i.e., intangible, right to honest government through the concealment of D'Alessio's breach of his duty to avoid conflicts of interest." *Id.* The Government claims that use of the United States mail was an integral part of both frauds.

### B. Commemoratives

■ As a preliminary matter, the court notes that sponsoring private commemoratives and utilizing their proceeds for a public official's private enrichment is not unlawful under the current state of the law in New Jersey. There is no statute in New Jersey that prohibits a public official's use of commemorative gifts for personal expenses. On the contrary, the New Jersey Law Enforcement Commission promulgated a regulation in 1974 that appears to condone such conduct. The regulation deals with the reporting requirements for "contributions for election-related activity." N.J.Admin.Code § 19:25–11.2. The regulation classifies as contributions for election-related activity "[e]very contribution to a candidate, political committee, political party committee or other

major purpose continuing political committee," and subjects all such contributions to the reporting requirements. N.J.Admin.Code §§ 19:25–11.1, 19:25–11.2(a). The regulation proceeds to demonstrate with examples the application of the reporting requirements. Example 2 provides that the proceeds realized at a private dinner held in honor of a political candidate to "commemorate" his service are not considered to be contributions and are not subject to the reporting requirements. The example states as follows:

> 2. Example 2: "Candidate B" has been elected to the office of freeholder in a county in New Jersey. All the preelection and post-election reports relating to his campaign have been filed and the business respecting the campaign has been wound up and all expenses in connection with the campaign have been paid. A group of friends, including a number of prominent local politicians, arrange a dinner in his honor to commemorate his years of faithful service to the party. Cash and other gifts of total value of $200.00 are given to him in the course of the dinner. There is no intention that these gifts be used for political purposes and they are not so used. The dinner and the gifts are not contributions to candidate B for political purposes and are not required to be reported.

N.J.Admin.Code § 19:25–11.2(a)(2). New Jersey regulations impose no other restrictions on such commemoratives or the use of monies given by contributors to such events.

■ Defendants submit that commemoratives are "a commonplace of New Jersey political life; that such events typically are held to honor the accomplishments of a local political figure; that the contributions made in connection with the commemorative are understood by all participants to have been given out of affection and respect by the contributors, and not for any election related purpose; that they are, in short, gifts." Defs.Mem. at 11–12.[4] Although state legisla-

---

4. Defendants distinguish "commemoratives" from "testimonial affairs" which are defined as: an affair of any kind or nature including, without limitation, cocktail parties, breakfasts, luncheons, dinners, dances, picnics or similar affairs directly or indirectly intended to raise campaign funds in behalf of a person who holds, or who is or was a candidate for nomi-

nation or election to a public office in this State, or directly or indirectly intended to raise funds in behalf of any political party committee or in behalf of a political committee, continuing political committee, candidate committee, joint candidates committee or legislative leadership committee.

tors have repeatedly proposed amendments to the campaign finance law that, while continuing to permit commemoratives, would limit the use of excess campaign funds to electoral purposes, the legislature never enacted any of the proposed bills.[5] The court recites this background to clarify what is not at issue in the indictment: New Jersey election laws do not prohibit candidates for public office from receiving and not reporting gifts given to them for their personal use.[6] The court now turns to defendants' objections to the indictment. Defendants attack both prongs of the fraud scheme alleged in the indictment.

### C. The Tangible Rights Theory

■ In regard to the tangible rights theory, defendants assert that a facial examination of the invitations and tickets indicate that they are not misleading. Defendants also argue that the Government will not be able to prove that they acted with specific intent. The court concludes that these arguments are improperly addressed to the weight of the Government's evidence. An indictment "may not properly be challenged by a pretrial motion on the ground that it is not supported by adequate evidence." *United States v. Gallagher*, 602 F.2d 1139, 1142 (3d Cir.1979), *cert. dismissed*, 444 U.S. 1040, 100 S.Ct. 713, 62 L.Ed.2d 675 (1980). Defendants' arguments require the court to make factual findings regarding the sufficiency of the Government's evidence; the court is not permitted to do this prior to the close of the Government's case in chief. *Costello v. United States*, 350 U.S. 359, 363, 76 S.Ct. 406, 408–09, 100 L.Ed. 397 (1956); *see also United States v. Donsky*, 825 F.2d 746, 752 & n. 8 (3d Cir.1987). The court thus concludes that defendants' arguments in support of its motion to dismiss the tangible rights prong of counts one through three are without merit. The court turns next to defendants' contentions regarding the Government's intangible rights theory of the case.

### D. The Intangible Rights Theory

Defendants have launched a multi-faceted attack on the intangible rights allegations of the indictment. The defendants' strongest argument is that the New Jersey Court Rule recited in paragraph 1(f) and relied on in paragraphs 2 and 3 does not apply to county sheriffs. Defendants present various reasons why Rule 1:16–2 does not apply to sheriffs.[7]

Defendants' first argument is that the plain language of Rule 1:16–2 does not refer to sheriffs. The second clause of Rule 1:16–2 prohibits the acceptance of gifts by "an employee of any court, or of any office serving a court." *See supra* note 3 (citing full text of Rule). Defendants argue that county sheriffs are not employed by the courts. Defendants further argue that sheriffs are not employees of an office that serves the court. Defendants concede that a sheriffs' office serves the court and that undersheriffs serve the court. However, they claim that sheriffs are not "employees" of their own offices. Instead, defendants argue that sheriffs have an independent status as constitutional officers who are elected by the citizens of their respective county.[8] As such, they assert that

Pub.L.1993, ch. 65, § 2. Proceeds from testimonials are required to be reported to the Election Law Enforcement Commission pursuant to N.J.Stat.Ann. §§ 19:44A–16(g), 19:44A–18.

5. S. 69, 205th Leg. (introduced Jan. 14, 1992); S. 399, 204th Leg. (introduced Jan. 9, 1990); S. 549, 203rd Leg. (introduced Jan. 12, 1988); S. 2307, 201st Leg. (introduced Oct. 18, 1984); S. 2070, 201st Leg. (introduced June 28, 1984). *But see* Pub.L. ch. 65, § 17 (approved March 8, 1993) (effectively prohibiting the personal use of excess campaign funds; no reference made to commemoratives) (see partial text at note 16).

6. However, the New Jersey Local Government Ethics Law, enacted in 1991, prohibits a local government officer or employee, a member of his immediate family, or a business organization in which he has an interest from soliciting and accepting any gift or other thing of value if the gift was given or offered for the purpose of influencing the local officer in the discharge of his official duties. N.J.Stat.Ann. § 40A:9–22.5(f). The Act further imposes a duty to report any "gifts, reimbursements or prepaid expenses having an aggregate value exceeding $400 from any single source." N.J.Stat.Ann. § 40A:9–22.6(3).

7. Defendants have been joined in their arguments regarding Rule 1:16–2 by *amicus curiae*, the Sheriff's Association of New Jersey.

8. Under the New Jersey State Constitution, a sheriff is elected once every three years by the franchised residents of each county. N.J. Const. art. VII, § 2, ¶ 2.

a duly elected sheriff *is the office* itself and not an employee of such an office. Defendants conclude that county sheriffs are beyond the reach of the second clause of Rule 1:16–2.

Defendants' second argument asserts that caselaw interpreting Rule 1:17 suggests that Rule 1:16–2 is meant to apply only to court personnel who have direct contact with a judge or a court. Rule 1:17–1 bars political activity by specified "persons in or serving the judicial branch of government." Rule 1:17–1. Rule 1:17–2 provides that the prohibition of political activity does not apply to "county clerks, county prosecutors, sheriffs, nor to employees of their respective offices, except as such employees are specifically referred to therein and except as otherwise provided by N.J.S. 2A:158–21 (proscribed political activity of county prosecutors and their staffs)." Rule 1:17–2.

In the case of *Matter of Randolph*, 101 N.J. 425, 502 A.2d 533 *cert. denied,* 476 U.S. 1163, 106 S.Ct. 2289, 90 L.Ed.2d 730 (1986), the New Jersey Supreme Court held that Rule 1:17–1 applied "not only to judges but to all court personnel." *Id.* 101 N.J. at 434–35. The *Randolph* court explained that "court personnel" is not a blanket reference to every employee of the sheriff's office, but only to those who are intimately involved with the courts:

> Rule 1:17–2 provides that the ban on political activity does not apply to all employees of sheriffs but only to sheriffs' employees who are specifically referred to in rule 1:17–1. As noted Norma Randolph is a court attendant who serves as a court crier and is regularly assigned to a judge or court.

*Id.* 101 N.J. at 435 n. 3.[9] The *Randolph* court concluded that in her position as a court attendant, Norma Randolph was included within the scope of Rule 1:17–1, but that if she was transferred to a position other than court officer or court attendant, she could maintain her political activities. *Id.*

101 N.J. at 455. The *Randolph* court thus appeared to hold that Rule 1:17–1 does not apply to a person not regularly assigned to a judge or court or a person who at most has indirect contact with the judge or court.

Defendants argue that Rule 1:16–2 applies to the same narrow class of "court personnel" that Rule 1:17 regulates. For support, defendants point out that the New Jersey Supreme Court once noted that the predecessor to Rule 1:16–2 was intended to address gifts or gratuities "to court personnel." Defs.Mem. at 16 (citing Report of the New Jersey Supreme Court's Committee on Rules, at 25 (Apr. 20, 1961)). In addition, defendants argue that Rules 1:16–2 and 1:17 are both aimed at maintaining the appearance of an impartial judiciary and should therefore be construed *in pari materia.* Defendants maintain that subjecting sheriffs to Rule 1:16–2 would not serve the rule's purpose of avoiding the reality and appearance of impropriety by those intimately involved in the judicial process. Defendants submit that the gift rule should apply only to those court personnel who are present in the courtroom or who work closely with a judge, relying in part on *Randolph*'s statement that impartiality is "destroyed or damaged each time that someone closely connected with the courts does something that judges should not do even though they are not judges." *Randolph,* 101 N.J. at 453.

Finally, defendants argue that applying Rule 1:16–2 to sheriffs would violate the separation of powers doctrine. Pursuant to Article VI, § 2, ¶ 3 of the New Jersey State Constitution, the New Jersey Supreme Court has the power to "make rules governing the administration of all courts in the State and, subject to the law, the practice and procedure in all such courts." In accordance with this power, the New Jersey Supreme Court promulgated the Rules Governing the Courts of the State of New Jersey, which includes Rule 1:16–2. The Supreme Court is prohibit-

---

**9.** The *Randolph* court cited with approval Chief Justice Weintraub's comment to new judges in 1968, which illuminates what is meant by "court personnel" and those who "serve" the court:

> Generally the idea is whatever restrictions apply to the judges apply to supporting personnel in the courtroom.... If they are assigned out

we have no interest in them. We are concerned with those that are assigned to the courtroom. If he wants to be on our end, on our side of the fence, he has to abide by the same restrictions that apply to us.

*Randolph,* 101 N.J. at 440–41 n. 6.

ed, however, from utilizing its rule-making power to make substantive law. *Busik v. Levine,* 63 N.J. 351, 377, 307 A.2d 571 *appeal dismissed,* 414 U.S. 1106, 94 S.Ct. 831, 38 L.Ed.2d 733 (1973); *Winberry v. Salisbury,* 5 N.J. 240, 248, 74 A.2d 406 *cert. denied,* 340 U.S. 877, 71 S.Ct. 123, 95 L.Ed. 638 (1950). Defendants argue that application of Rule 1:16–2 to a sheriff would give this Rule the effect of substantive law, in violation of the separation of powers concerns set forth in *Busik* and *Winberry.*

Defendants concede that Rule 1:16–2 should apply to court personnel who are intimately involved with a judge or court. Defendants further concede that certain court rules can and do regulate the conduct of sheriffs. *See, e.g., In re Petit Jury Panels, Essex County,* 60 N.J. 554, 561, 292 A.2d 4 (1972) (The Court may regulate sheriff's control of juries since "the selection and summoning of jury panels plays an important and vital role in the administration of the court system throughout the State."). Defendants posit, however, that applying the gift rule to sheriffs would extend the Supreme Court's reach beyond actions that reflect upon the integrity and impartiality of the court. For example, it would bar gifts from anyone "who has had or is likely to have any professional or official transaction with such ... office," even though those persons' business with the sheriff has no relation to the judicial process. Defendants argue that this interpretation of Rule 1:16–2 would improperly extend the Supreme Court's rule-making power beyond the regulation of the courts' administration or practice and procedure and into the making of substantive law.

Defendants further argue that if Rule 1:16–2 is read as prohibiting sheriffs from receiving gifts, it would override the effect of the Local Government Ethics Law of 1991, which permits local and county public officials to receive and not disclose gifts of up to $400 from a single source so long as the gift

was not given for the purpose of influencing the discharge of the official's duties. N.J.Stat.Ann. § 40A:9–22. Defendants submit that this court should not interpret Rule 1:16–2 to create a conflict between legislative and court directives regarding the sheriff's office.

In response, the Government argues that the plain language of Rule 1:16–2 makes it applicable to sheriffs.[10] The Government submits that the Office of the Sheriff is an "office serving the court" and that it would be anomalous to read the rule to apply to a sheriff's employees but not to the sheriff himself. The Government further contends that defendants' interpretation of Rule 1:16–2 as applying only to judges and their close associates would render meaningless the terms "any office serving the court" in the Rule's second clause and "any other governmental agency or officer" in the Rule's first clause. The Government asserts that a construction of a statute that produces an absurd result or emasculates a provision of the statute is to be avoided, citing 2A Sutherland, *Statutory Construction* § 45.12, at 61 (5th ed. 1992).

The Government next argues that the legislative history of Rule 1:16–2 indicates that the New Jersey Supreme Court intended the rule to apply to a broad class of people. The predecessor to Rule 1:16–2, Rule 1:34, was patterned after the New York Appellate Division Rule that prohibited the giving of gifts or gratuities to court employees. *See* Report of the New Jersey Supreme Court's Committee on Rules, at 25 (Apr. 20, 1961). The drafters of New Jersey Rule 1:34 extended the language to include "any employee of any court, or of any office serving a court, or of any other governmental agency." *Id.* In 1969, the drafters of the current Rule 1:16–2 expanded its scope to prevent gift-giving by any person "who has" or "who is likely to have" business before the courts of New

---

**10.** As a preliminary note, the Government contends that counts one through three should survive because they plead the requisite elements of a mail fraud count. The Government relies on *Hamling v. United States,* 418 U.S. 87, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974), for the proposition that "an indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against

which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *Id.* at 117, 94 S.Ct. at 2907. While true, this principle is not relevant to the court's discussion because defendants do not contest that the pleading is insufficient, but rather that it contains a statement of law that is arguably inaccurate.

Jersey. Based on this evidence regarding the drafters' expansive intent, the Government submits that defendants' limited reading of Rule 1:16–2 is belied by its legislative history.

The Government's final argument is that the sheriff acts in a dual capacity as an officer of the court and as a law enforcement officer and is thus subject to the rules of both the judicial and executive branch. The Government cites to various court rules which regulate the ways in which a sheriff is to execute his duties. *See, e.g.,* Rule 4:59–1 (providing for the execution of levies); Rule 4:60–8 (providing for the return of levies); Rule 4:60–6 (providing for the service of process). The Government also cites to various cases which have held that the court may regulate the Office of the Sheriff. *See, e.g., In re Application of Burlington County Bd. of Chosen Freeholders,* 99 N.J. 90, 491 A.2d 631 (1985) (permitting superior court to supervise an investigation into allegations of corruption by a sheriff); *In re Petit Jury Panels in Essex County,* 60 N.J. 554, 292 A.2d 4 (1972) (enjoining sheriff from interfering with court's supervision and selection of petit juries).[11] The Government argues that as an officer of the court who conducts such court business as executing a sheriff's sales of real estate, a sheriff is appropriately prohibited by Rule 1:16–2 from accepting gifts from persons who may conduct business with his office. The Government submits that the application of Rule 1:16–2 to sheriffs properly protects the impartiality and integrity of the courts' administration of justice.

In response to defendants' specific arguments about Rule 1:16–2, the Government alleges that the text of Rule 1:17 supports its reading of Rule 1:16–2 because Rule 1:17–2 demonstrates that the legislature was capable of excepting sheriffs from the reach of a court rule when such was their intent. The Government submits that since Rule 1:16–2 and Rule 1:17–2 were considered by the courts at the same time, this court should regard the distinction between the rules as a purposeful one. The Government also asserts that defendants' argument regarding the separation of powers doctrine is fatally flawed because the New Jersey Local Government Ethics Law, which defendants claim conflicts with Rule 1:16–2, was not in effect at the time the offense conduct took place and, furthermore, is not facially inconsistent with the provisions of Rule 1:16–2.

■ Having reviewed all of the arguments regarding Rule 1:16–2, the court determines that there is a significant degree of ambiguity regarding the applicability of the Rule to county sheriffs. Although the context of this motion does not require the court to definitively resolve this issue, the court determines that a New Jersey court faced with the same question could well decide that the Rule does not apply to county sheriffs. The legal effect of the Rule's ambiguous application directly implicates concerns underlying the rule of lenity.

■ The rule of lenity provides that if a court must choose between two readings of a criminal statute, the court should apply the more lenient one, leaving it to the legislature to speak in clearer terms if the harsher alternative is intended. *United States v. Bass,* 404 U.S. 336, 347, 92 S.Ct. 515, 522, 30 L.Ed.2d 488 (1971) (citation omitted). The Supreme Court noted in *Bass* that the rule is founded on two policies:

> First, "a fair warning should be given to the world in language that the common world will understand, of what the law intends to do if a certain line is passed. To make the warning fair, so far as possible the line should be clear. Second, because of the seriousness of criminal penalties, and because criminal punishment usually represents the moral condemnation of the community, legislatures and not courts should define criminal activity.

*Bass,* 404 U.S. at 348, 92 S.Ct. at 522–23 (citations omitted). Although the court here is asked to construe Rule 1:16–2 and not the criminal statute pursuant to which the indictment was brought, the notice concerns motivating the rule of lenity provide wise guidance to this court. Specifically, they suggest that any uncertainty regarding the applicability of the Rule should be resolved in favor of the defendants.

---

**11.** However, the Government conceded at oral argument that there is no New Jersey caselaw holding that Rule 1:16–2 applies to sheriffs. Oral Arg.Tr. at 36.

The court finds further support for this conclusion in the analogous case of *United States v. General Dynamics Corp.*, 644 F.Supp. 1497 (C.D.Cal.1986), *rev'd on other grounds*, 828 F.2d 1356 (9th Cir.1987). In *General Dynamics*, defendants moved to dismiss an indictment charging them with conspiring to defraud the United States and filing false writings and documents with the Department of Defense. The court found that the defense contract at issue was potentially unclear as to whether it was a "best efforts" contract, in which case defendants' charging of costs beyond the fixed price of the contract to other funds it received from the Department of Defense was permissible, or a "fixed price" contract, in which case defendants' excess charges to other accounts was improper. Defendants argued that the contract and the regulations surrounding it were so terribly ambiguous that their actions did not constitute a crime. The court referred the question of how the contract should be interpreted to the Armed Services Board of Contract Appeals and dismissed the defendants' motion as premature.

However, in its discussion of defendants' arguments, the court observed that the indictment's reliance on a contract that was possibly unclear touched "fundamental principles of legality." *General Dynamics*, 644 F.Supp. at 1500. The court then cited to the rule of lenity and the quote included in the *Bass* decision regarding the sufficiency of notice that must attend criminal laws. *Id.* The court then stated that:

> The principle [of legality] further supports the oft expressed view that an individual cannot be found to have the intent to violate a vague or highly debatable law, *United States v. Mallas*, 762 F.2d 361 (4th Cir.1985), and that if "no statute, regulation, or court decision gave fair warning" it would be a violation of the fifth amendment to the United States Constitution to permit a prosecution. *United States v. Dahlstrom*, 713 F.2d 1423, 1429 (9th Cir. 1983). As the Court of Appeals suggested in *United States v. Critzer*, 498 F.2d 1160, 1164 (4th Cir.1974), a criminal prosecution is not the place to decide pioneering interpretations of the law.

*Id.* 644 F.Supp. at 1500–01. This discussion in *General Dynamics* is particularly relevant to the case at hand. No caselaw or advisory opinion exists that applies Rule 1:16–2 to sheriffs, and the Rule itself is arguably ambiguous. The court thus concludes that defendant D'Alessio, as a sheriff, did not receive "fair warning" that he was bound by Rule 1:16–2. Accordingly, he cannot be criminally prosecuted for an alleged breach of duties owed as a result of the Rule. It follows that Thor cannot be prosecuted for aiding D'Alessio in the breach of his supposed duties under Rule 1:16–2.

 The court must next determine whether the inclusion of Rule 1:16–2 in counts one through three requires the dismissal of the intangible rights prong of these counts. The Government stated at oral argument that even if Rule 1:16–2 is not applicable to sheriffs, the indictment can still survive because it alleges other bases for the sheriff's duty to act justly and impartially. In effect, the Government is asking the court to amend the indictment in order to ignore any improper references to Rule 1:16–2. However, the court cannot make changes to an indictment that alters the substance of the charged offense. *United States v. Field*, 875 F.2d 130, 133 (7th Cir.1989); *United States v. Kegler*, 724 F.2d 190, 193–94 (D.C.Cir.1983).

In the present case, striking all references to Rule 1:16–2 from the indictment would so alter the nature of the fraud alleged as to constitute an improper amendment of the grand jury's charges. An analysis of paragraphs 2 and 3 indicates that the intangible rights part of the fraud scheme charged by the grand jury relies heavily on D'Alessio's alleged duties under Rule 1:16–2. Specifically, paragraph 3 refers to D'Alessio's scheme to deceive "attorneys and others into giving gratuities and gifts to an officer of the court in violation of the Rules of the Courts of the State of New Jersey." This language clearly relies on D'Alessio's posited duty not to accept gifts from attorneys or others who would have official business with his office.

The Government's brief further indicates the centrality of Rule 1:16–2 to its intangible rights theory. The Government states that counts one and three "embody a straightforward charge that the people of Essex County were denied their right to the honest services

of their sheriff when he solicited, accepted and used gifts in violation of his duty as an officer of the Court." Govt.Mem. at 16. At another point, the Government states that "these Counts allege that the defendants' scheme to solicit gifts from those who were not permitted to give them compromised the integrity of the sheriff's performance of his duties." Govt.Mem. at 24.

The wording of the indictment and the Government's explanation of it indicate that the intangible rights portion of the mail fraud charges is centrally based on the presumption that D'Alessio as a sheriff could not solicit or accept personal gifts. Indeed, the theory of the indictment suggests that even if the invitations at issue included a frank disclosure that all contributions would be used for D'Alessio's private benefit, the sending of them would still cause D'Alessio to violate his duty under Rule 1:16–2 not to solicit gifts.[12] Thus, the court concludes that the intangible rights portion of the fraud charges is fundamentally dependant on D'Alessio's alleged duties under Rule 1:16–2. Striking any references to the Rule would therefore be improper. As stated in *United States v. Cryan,* 490 F.Supp. 1234 (D.N.J.), *aff'd,* 636 F.2d 1211 (3d Cir.1980), "[t]he power of a court to 'amend' an indictment is limited by the Fifth Amendment guarantee that an individual be tried only on a charge returned by a grand jury." *Id.* 490 F.Supp. at 1244. While striking all references to Rule 1:16–2 might yield an indictment which successfully charges an intangible rights fraud scheme, the question is whether it would charge the *same* intangible rights fraud scheme returned by the grand jury. *See Cryan,* 490 F.Supp. at 1244 n. 21. The court rules that it would not. The grand jury may have indicted the defendants on the sole premise that the mere solicitation of private gifts was prohibited. Reliance on that premise may have tainted all of their charges. Without it, the grand jury may not have indicted the defendants at all or differently. The court should not and will not speculate as to what the grand jury would have done; nor will it amend or alter what it has done. The court thus concludes that the intangible rights prong of counts one through three is facially invalid because it relies on a Rule that this court concludes is too ambiguous to be applied to defendants for the purposes of a criminal prosecution.

### E. Must Counts One Through Three Be Dismissed in their Entirety?

◼ The court must next determine whether the invalidity of the intangible rights prong of counts one through three requires the dismissal of counts one through three in their entirety. The court determines that there is a possibility that even though Rule 1:16–2 was recited in the indictment solely for the purposes of the intangible rights fraud charges, its inclusion may have also played a part in the jury's decision to indict on the tangible rights fraud charges. For example, the grand jury may have believed that it was unlawful for D'Alessio to solicit gifts by hosting a commemorative regardless of whether his invitations were misleading. Conversely, they might not have indicted him for any crime if they did not believe that he was prohibited from soliciting and receiving such gifts, irrespective of the representations made.

The court simply cannot determine whether and to what extent the inclusion of Rule 1:16–2 in counts one through three (and the impression that it created that D'Alessio had a duty not to solicit gifts) led the grand jury to indict on the charges that D'Alessio knowingly, willfully and unlawfully devised a scheme to defraud the contributors to his March 1989 fundraiser of money and property. Because the court does not and cannot know the reasoning behind the grand jury's decision, it cannot allow either prong of the alleged mail fraud scheme to go forward. While the court acknowledges that the language of the indictment may be read to find that the tangible rights fraud scheme does not rely on D'Alessio's implied breach of duties as a court officer, the court cannot select among the theories on which the grand jury may have relied. *Cryan,* 490 F.Supp. at 1244 ("A court may not substitute its views or the views of the prosecution for those of

---

12. However, when questioned on this point at oral argument, the Government stated that if defendant's mailings frankly disclosed that he planned to breach his alleged duties under Rule 1:16–2, the Government would not be able to prosecute him for mail fraud. Oral Arg.Tr. at 8–9.

the grand jury."). Because there is a distinct and reasonable possibility that the inclusion of Rule 1:16–2 in counts one through three infected both prongs of the indictment's alleged mail fraud scheme, the court must dismiss these counts in their entirety.[13]

### F. Counts Four and Five

■ Finally, the court turns to consideration of counts four and five. These counts charge that defendants engaged in transactions designed in whole or in part to conceal and disguise the nature, source, ownership and control of the proceeds from the March 1989 fundraiser, in violation of the federal money laundering statute. To establish a money laundering offense, the Government must demonstrate that defendants engaged in a financial transaction to conceal the proceeds of "specified unlawful activity." 18 U.S.C. § 1956. According to the indictment, the specified unlawful activity is the alleged mail fraud charged in counts one through three. Since counts one through three have been dismissed, there is no basis upon which to support the money laundering charges in counts four and five, and therefore, they must be dismissed as well.

### II. Defendants' Motion to Dismiss Count Six

#### A. The Indictment

Count six of the superseding indictment charges defendants with mail fraud for using surplus campaign funds from D'Alessio's campaign for the County Executive position to pay for a vacation. The court again turns to an examination of the indictment's text to start its analysis. The first two paragraphs of count six identify the defendants and the third alleges that they operated and controlled a fund entitled "Tom D'Alessio '90, Inc.," which was the depository for political contributions made during D'Alessio's campaign for County Executive. The next three paragraphs identify defendants' "Duty to Honestly Use and Report Campaign Expenses." They state as follows:

d. The defendants Thomas J. D'Alessio and Joseph Thor, had a duty, imposed by the New Jersey Campaign Contributions and Expenditures Act, N.J.S.A. 19:44A–1, to keep detailed accounts of all disbursements from the Fund and to file periodically a true and public record of those disbursements with the New Jersey Election Law Enforcement Commission.[14]

e. The defendants Thomas J. D'Alessio and Joseph Thor also had a duty, imposed by New Jersey Administrative Code 19:25–7.2, not to convert campaign contributions to personal use.[15]

f. The defendants Thomas J. D'Alessio and Joseph Thor, having access to and control of the Fund, also had a fiduciary duty to contributors, creditors and the public, to honestly account for expenditures from the Fund.

13. The parties' briefs raise the interesting question of whether the indictment would be valid if it contained no references to Rule 1:16–2 and instead relied solely on D'Alessio's duties pursuant to his oath of office. Defendants argue that even aside from the indictment's defective reliance on Rule 1:16–2, counts one through three fail to allege an intangible rights fraud scheme because they fail to allege that D'Alessio was derelict in his duties. More specifically, defendants argue that counts one through three fail to ·allege that the contributors gave gratuities in exchange for favors, that they received preferential treatment from D'Alessio, that D'Alessio engaged in self-dealing, or that D'Alessio misperformed any of his duties. The Government counters that it is sufficient to allege an intangible rights fraud by stating that a public official deprived the electorate of his "honest services," and that the present indictment satisfies this standard. Because the court finds that the reliance of the indictment on Rule 1:16–2 renders it invalid, the court makes no determination on the

parties' arguments regarding the necessary elements of an intangible rights fraud charge.

14. N.J.Stat.Ann. §§ 19:44A–1 et seq. provides a statutory scheme to "require the reporting of all contributions received and expenditures made to aid or promote the nomination, election or defeat of any candidate for public office or to aid or promote the passage or defeat of a public question in any election and to require the reporting of all contributions received and expenditures made to provide political information on any candidate for public office, or on any public question." N.J.Stat.Ann. § 19:44A–2.

15. N.J.Admin.Code § 19:25–7.2 is entitled "Use of funds; general" and provides as follows:

Funds so deposited may be used in accordance with the provisions of the act and of these regulations for any lawful purpose. Such funds shall not be converted to any personal use by the candidate or any other person.

Paragraph 2 of count six states the basis for the mail fraud charge as follows:

2. From in or about February 1990 and continuing through February 1991, in Essex County in the District of New Jersey and elsewhere, the defendants Thomas J. D'Alessio and Joseph Thor knowingly, willfully and unlawfully did devise and intend to devise a scheme and artifice to defraud

a. contributors to and creditors of the 1990 election campaign of the defendant Thomas J. D'Alessio for the Office of County Executive, and the Fund itself, of money and property;

b. contributors to and creditors of the 1990 election campaign of the defendant Thomas J. D'Alessio for the Office of the County Executive, and the Fund itself, of the honest and faithful services of the defendants; and

c. taxpayers, citizens and residents of Essex County and elsewhere of their right to the honest and faithful services of the defendants

by means of false and fraudulent pretenses, representations, and promises.

The Government's brief explains that this count charges defendants with defrauding D'Alessio campaign contributors, creditors and the campaign fund of money and property by embezzling campaign funds and concealing that embezzlement through the filing of false election reports. The Government labels this "a classic violation of tangible rights." Govt.Reply at 13. The Government states that count six also alleges two different intangible rights schemes. Through the first, defendants defrauded D'Alessio campaign contributors, creditors and the campaign fund of their honest and faithful services by embezzling money and failing to account accurately for it. Through the second, defendants defrauded the public of its intangible right to the defendants' honest services by failing to provide an accurate accounting of election expenditures as required by state election laws. Govt.Reply at 13–14. The Government maintains that the mailing of "stolen funds" to D'Alessio's credit card company as partial payment for D'Alessio's Aruba vacation was central to all three of these fraud schemes. Govt.Reply at 13. Defendants assert several objections to both the tangible rights fraud scheme and the intangible rights fraud scheme.

### B. The Intangible Rights Theory

In regard to the intangible rights scheme, defendants argue that count six is flawed because (1) a single false report cannot be the basis for a mail fraud prosecution, and (2) a candidate for public office is not charged with any obligation to provide honest services. The first contention is without merit because it essentially disputes the sufficiency of the Government's evidence. Defendants argue that the Government will be unable to demonstrate that a "single error" in their disbursement report constituted a "scheme to defraud." Defs.Mem. at 56. Defendants apparently believe that the Government must show multiple acts in order to prove a mail fraud scheme. However, the Third Circuit has held that the term "scheme to defraud" requires only that the Government show "some form of planning or pattern." *United States v. Pearlstein*, 576 F.2d 531, 535 (3d Cir.1978). It will be for the jury to decide whether the Government has proven that the circumstances surrounding the allegedly false report show that defendants planned to defraud campaign contributors, creditors, the campaign fund, and the public of the defendants' honest services. As stated previously, a pre-trial motion to dismiss the indictment may not challenge the adequacy of the Government's evidence. *See United States v. Gallagher*, 602 F.2d 1139, 1142 (3d Cir.1979), *cert. dismissed*, 444 U.S. 1040, 100 S.Ct. 713, 62 L.Ed.2d 675 (1980).

Defendants' second argument against the intangible rights scheme is also flawed. Defendants allege that the intangible right component of the mail fraud statute protects "any employer or other entity which engages a person to perform services," citing *United States v. Piccolo*, 835 F.2d 517, 520 (3d Cir.1987), *cert. denied*, 486 U.S. 1032, 108 S.Ct. 2014, 100 L.Ed.2d 602 (1988). Defendants then argue that a candidate for public office is not "employed" or "engaged" to perform any "services" by the public, the contributors to a campaign fund, the fund's creditors, or the fund itself. Defs.Mem. at 57.

In response to the defendants' argument that a candidate *qua* candidate is immune from mail fraud prosecution on an intangible rights theory, the Government argues that cases involving prosecutions of candidates for public office for defrauding the citizenry of its right to honest services are fairly common. The Government relies on Justice Stevens' dissenting opinion in *McNally v. United States*, 483 U.S. 350, 363, 107 S.Ct. 2875, 2883, 97 L.Ed.2d 292 (1987), and the cases it cites. *See, e.g., United States v. Girdner*, 754 F.2d 877 (10th Cir.1985); *United States v. Odom*, 736 F.2d 104 (4th Cir.1984); *United States v. States*, 488 F.2d 761 (8th Cir.1973), *cert. denied*, 417 U.S. 909, 94 S.Ct. 2605, 41 L.Ed.2d 212 (1974). These cases involve candidates for public office and their campaign workers who were convicted for using the mails to falsify votes. The court acknowledges that this caselaw is from the pre-*McNally* period and that the majority opinion in *McNally* severely restricted the reach of the mail fraud statute by invalidating prosecutions based on intangible rights violations. However, in 1988, Congress passed 18 U.S.C. § 1346, which overruled *McNally* to the extent that it re-allowed prosecutions based on violations of another's right to "honest services." Section 1346 did this by providing that the term "scheme or artifice to defraud" as used in the mail fraud chapter "includes a scheme or artifice to deprive another of the intangible right of honest services." 18 U.S.C. § 1346. In the wake of section 1346, the pre-*McNally* caselaw relied on by the Government still has persuasive effect. These cases' application of the mail fraud statute based on intangible rights violations to candidates has not been called into question by the language of section 1346. Moreover, defendants have not pointed to any subsequent caselaw which supports their constricted view of the statute's reach.

In support of the indictment's specific charges, the Government asserts that a defendant charged with embezzling campaign funds and violating the citizenry's right to honest services need not hold an elected office. As argued by the Government, it is enough that the defendant place himself in a position of public trust and owe a duty of honesty to the alleged victims of his fraud. The Government cites to *United States v.*

*Curry*, 681 F.2d 406 (5th Cir.1982), and *United States v. Pisani*, 773 F.2d 397 (2d Cir. 1985), for support. In *Curry*, the Fifth Circuit upheld the mail fraud conviction of a chairman of a political action committee on the basis that he embezzled campaign funds and mailed false reports to the state election committee to conceal the theft. The indictment charged that the chairman had defrauded the political action committee's membership of their right to his honest services and the election commission of its right to obtain true and accurate financial disclosure reports. *Curry*, 681 F.2d at 411.

In *Pisani*, the defendant was convicted of defrauding his political campaign funds based on his use of campaign contributions for personal purposes and his filing of false campaign expenditure reports. The Second Circuit reversed the conviction because New York state law did not prohibit a candidate from using campaign funds for personal expenses at the time of the offense conduct. However, the *Pisani* court acknowledged that the indictment would be affirmed if a 1985 statute prohibiting the personal use of campaign funds had been in effect during the period covered by the defendant's conduct. The Government contends that both *Curry* and *Pisani* support its position that candidates owe a duty of honesty to their campaign fund, the fund's contributors, the fund's creditors and the public. The court finds the Government's analysis to be persuasive and rejects defendants' argument that candidates cannot be prosecuted under the mail fraud statute for violating another's intangible right to honest services.

## C. The Tangible Rights Theory

The court turns next to defendants' objections to the tangible rights theory of count six. Defendants' initial complaint with this portion of the charge is that it fails to allege a "scheme to defraud." Defs.Mem. at 59. More specifically, defendants dispute the Government's ability to prove that defendants engaged in some form of "fraudulent misrepresentations or omissions reasonably calculated to deceive persons of ordinary prudence and comprehension." Defs.Mem. at 67–68, quoting *United States v. Pearlstein*,

576 F.2d 531, 535 (3d Cir.1978). This objection is similar in nature to defendants' earlier complaint that the Government could not establish that a single disclosure error constituted a "scheme to defraud." Both objections improperly attack the sufficiency of the Government's evidence. Since defendants' arguments again require the court to make factual findings, they are inappropriate at this stage of the proceeding.

■ Defendants' final challenge to count six of the indictment asserts that New Jersey law regarding the use of surplus campaign funds was highly ambiguous during the period covered by the indictment and cannot form the basis of a criminal prosecution. Defendants note that the New Jersey Legislature recently passed a law that enacted, for the first time, a ban on the personal use of campaign funds. Pub.L.1993, ch. 65, § 17 (approved March 8, 1993).[16] Defendants claim that the prior absence of a statutory proscription on the personal use of campaign funds rendered the state of the law on this issue ambiguous.

The Government counters that this argument is disingenuous because New Jersey Administrative Code § 19:25–7.2 has been in effect in its current form since 1987 and clearly states that campaign funds "shall not be converted to any personal use by the candidate or any other person." *See supra* note 15 (citing full text of Regulation). De-

fendants admit the existence of this regulation, but argue that it is an *ultra vires* promulgation by the New Jersey Election Law Enforcement Commission ("NJELEC").[17] Defendants contend that the election finance statute did not delegate authority to the NJELEC to regulate personal use of campaign funds and that section 19:25–7.2 is thus invalid. Defendants point to testimony that took place before the Ad Hoc Commission on Legislative Ethics and Campaign Finance in May of 1990 which recognized that the personal use of campaign funds was not prohibited by statute and noted that the regulations which addressed the issue "had never been tested."[18] Based on this testimony, defendants argue that a substantial ambiguity existed in New Jersey law regarding the use of campaign funds for personal expenses and that they should not be subject to criminal prosecution based on the breach of uncertain duties.

■ The Government's only response to defendants' *ultra vires* argument is that this court is not the appropriate forum to determine the legitimacy of the regulation. The Government claims that if defendants believed that the regulation was improperly promulgated, they should have challenged it either in the administrative forum at the time that it was being considered or in the New Jersey Appellate Division under New Jersey

---

**16.** The law effectively prohibits the personal use of campaign funds by requiring that campaign funds be used only for specifically enumerated purposes. Section 17(a) states as follows:

All contributions received by a candidate, candidate committee, a joint candidates committee or a legislative leadership committee shall be used only for the following purposes:
(1) the payment of campaign expenses;
(2) contributions to any charitable organization described in section 170(c) of the Internal Revenue Code ...;
(3) transmittal to another candidate, candidate committee, or joint candidates committee, or to a political committee, continuing political committee, legislative leadership committee or political party committee, for the lawful use by such other candidate or committee;
(4) the payment of the overhead and administrative expenses related to the operation of the candidate committee or joint candidates committee of a candidate or a legislative leadership committee;
(5) the pro-rata repayment of contributors; or

(6) the payment of ordinary and necessary expenses of holding public office.
A note to the section provides that "campaign expenses" relates to items or services used in connection with an election campaign, "other than those items or services which may reasonably be considered to be for the personal use of the candidate, any person associated with the candidate or any of the members of a legislative leadership committee."

**17.** Defendants also argue that the regulation's provision that campaign funds not be used for the private expenses of any "candidate" suggests that the regulation was intended to apply only to use of campaign funds *during a candidacy* and that post-election use is therefore not covered. The court rejects this tortured reading of the regulation as meritless.

**18.** Transcript of Hearing before the Ad Hoc Commission on Legislative Ethics and Campaign Finance, at 78 (May 2, 1990) (comment by Dr. Frederick M. Herrman, Director of the Commission).

Court Rule 2:2–3(a)(2) (providing for review of the validity of any rule promulgated by any state administrative agency or officer, with certain exceptions not relevant here). Govt.Reply at 20. The Government concludes that defendants' failure to assert a prior legal challenge to the regulation bars them from questioning its validity once their conduct has violated it. The court rejects this argument. Count six of the indictment relies in part on the standard of conduct prescribed by Section 19:25–7.2. As noted above, paragraph 1(e) of count six specifically states that defendant "had a duty, imposed by New Jersey Administrative Code 19:25–7.2, not to convert campaign contributions to personal use." Because the regulation forms an underlying basis for the charged offense, defendants are entitled to a ruling regarding its legality.

Upon review of defendants' arguments, the court determines that there is a certain degree of ambiguity regarding whether the NJELEC exceeded the scope of its powers in promulgating Section 19:25–7.2. The New Jersey Campaign Contributions and Expenditures Reporting Act created the NJELEC in 1973 and specifically designated its duties and powers. The provision pertaining to the NJELEC's rule-making authority states, in relevant part, that "[t]he commission shall promulgate such regulations and official forms and perform such duties as are necessary to implement the provisions of this act." N.J.Stat.Ann. § 19:44A–6. It is pursuant to this delegation of authority that the NJELEC promulgated Section 19:25–7.2 prohibiting the personal use of campaign funds. However, at the time that this rule was promulgated, the New Jersey Campaign Contributions and Expenditures Reporting Act did not expressly regulate the use of campaign funds; rather the Act regulated the reporting of campaign funds and expenditures. Defendants point out that for the last nine years, the New Jersey Legislature considered, but rejected bills that would prohibit the personal use of excess campaign funds. *See supra* note 5. It was not until this past March of 1993 that such a legislative directive was actually approved. Defendants thus argue that in light of the persistent refusal of the Legislature to enact any restrictions on the personal use of electorate

funds, the NJELEC's promulgation of Section 19:25–7.2 represents an acute divergence from the express terms of its enabling Act.

Defendants further allege that even the Executive Director of the NJELEC, Dr. Frederick M. Herrman, conceded that the state of the law regarding personal use of campaign funds was uncertain. In hearings by the Ad Hoc Commission on Legislative Ethics and Campaign Finance, Dr. Herrman stated that:

> [T]he statute doesn't talk at all about what's appropriate to use the money for. The statute does not even prohibit personal use. We've done that by regulation, and a couple of years ago the Commission—basically, I think out of frustration—put in regulations, which we think don't go beyond the statute, but it's never been tested.

Transcript of Hearing before the Ad Hoc Commission on Legislative Ethics and Campaign Finance, at 78 (May 2, 1990). Dr. Herrman added, "today, you could go to Hawaii and it would be statutorily appropriate." *Id.* at 81. At a subsequent hearing, Dr. Herrman reiterated his comments on the possible lack of legislative authority for the regulation:

> Basically what the Commission would like to see is a set of guidelines in the statutes of how this money can be used. Currently, it is really wide open. Our current law doesn't even say that personal use of the money is illegal. So what we would like to see is a consensus in the Legislature with the Governor, to be put into a statute which would just clearly specify how that money may be used.

Transcript of Hearing before the Ad Hoc Commission on Legislative Ethics and Campaign Finance, at 75–76 (Aug. 8, 1990). These hearings took place in May and August of 1990, the relevant time period covered by count six of the indictment.

Defendants argue based on this analysis that a New Jersey court would deny the NJELEC's power to promulgate Section 19:25–7.2. Defendants cite to *In re Closing of Jamesburg High School*, 83 N.J. 540, 416 A.2d 896 (1980) for the proposition that "[w]here there exists reasonable doubt as to

whether such power is vested in the administrative body, the power is denied." *Id.* 83 N.J. at 549. Defendants also cite to *Jersey City Incinerator Auth. v. Dep't of Pub. Utilities,* 146 N.J.Super. 243, 369 A.2d 923 (App. Div.1976), *appeal dismissed,* 75 N.J. 600, 384 A.2d 830 (1978), for the principle that regulatory powers are "not to be lightly implied" but "must be firmly anchored in some clear legislative delegation of jurisdiction." *Id.* 146 N.J.Super. at 256.

After reviewing these arguments, the court concludes that defendants have demonstrated that substantial ambiguity regarding the legality of Section 19:25–7.2 exists such that the regulation should not provide an underlying basis for defendants' federal criminal prosecution.[19] Although the court declines to invalidate the regulation, it determines that the indictment's reliance on it mandates dismissal of count six.[20]

*Conclusion*

For the foregoing reasons, defendants' motion to dismiss the indictment is granted in its entirety.

---

**19.** However, the court notes that it places little weight on defendants' argument that the Legislature's recent enactment regarding the use of campaign funds proves that there was no authority for the regulation. Defendants refer to a principle of construction that the "Legislature is presumed to be familiar with its own enactments, and to have passed or preserved cognate laws with the intent that they be construed to serve a useful and consistent purpose." Defs. Reply at 31 n. 31, quoting *Zoning Bd. of Adjustment v. Service Elec. Cable Tel.,* 198 N.J.Super. 370, 380–81, 487 A.2d 331 (App.Div.1985). Defendants argue from this principle that recognizing the validity of Section 19:25–7.2 "would ren-

der nugatory the present enactment." *Id.* However, this principle has no applicability to the situation before the court because the legislative enactment did not overlap with a previous statute; it codified a prior regulation.

**20.** The court expresses no view regarding whether count six would be valid if all references to the Regulation were omitted or if the count related only to the filing of an allegedly false report with the NJELEC. For the reasons stated in the court's discussion of counts one through three, a defect in one part of the charge requires dismissal of the entire count.